# TERRITORY OF HAWAII *v.* CLAYTON M. LANIER.

## NO. 2911.

Argued March 6, 1953.  Decided March 31, 1953.

Towse, C. J., Le Baron and Stainback, JJ.

OPINION OF THE COURT BY STAINBACK, J.

An information was filed pursuant to chapter 299, Revised Laws of Hawaii 1945, as amended, upon the statement of facts of the complaining witness alleging that she was an unmarried female residing in Honolulu and that on March 5, 1951, she gave birth to a female child which at the time of the trial was alive, dependent for support and not emancipated nor adopted; that Clayton M. Lanier, of Honolulu, is and was the father of the said illegitimate child, said child having been conceived as the result of sexual intercourse between the said complaining witness and Clayton M. Lanier occurring during the interval of June 10 to June 20, 1950, in Honolulu aforesaid. To this the defendant, Clayton M. Lanier, entered a plea of not guilty. The case was heard, jury waived, and judgment against defendant Lanier was entered on July 22, 1952.

The government called Lanier as an adverse witness under section 9847.02. He took the stand and, over the objection by his attorney, testified.

The first error assigned by plaintiff in error Lanier is that section 9847.02, Revised Laws of Hawaii, as amended, is not applicable to paternity proceedings as the same is a criminal or quasi-criminal proceeding.

This court has already construed the so-called bastardy statute as a civil and not a criminal proceeding. (*Territory* v. *Good,* 27 Haw. 8.) The syllabus is as follows: "The proceedings provided for by R. L., Ch. 172, relating to the support of bastards, are civil in their nature. It is sufficient, therefore, in order to justify a judgment against the respondent for the support of the child, if the petitioner's

case is proven by a preponderance of the evidence."

This is in accordance with the general rule. (10 C. J. S. 143, Bastards, § 32-A; 7 Am. Jur. 680, Bastards, § 81.)

A situation exactly similar to the present proceeding has arisen in at least two other jurisdictions where cross examination under the "adverse witness statute" was applicable. (*State* v. *Jeffrey,* 188 Minn. 476, 247 N. W. 692; *State* v. *McKay,* 54 N. D. 801, 211 N. W. 435.) In these two cases, both paternity proceedings, the defendants in each case were called by the State for cross examination under their respective "adverse witness statute." Calling a witness and compelling him to testify was assigned as error on the ground that no person can be compelled to be a witness against himself in a criminal action.

In the case of *State* v. *McKay, supra,* the statement was made as follows: "This is not a criminal action. * * * In the case of State v. Southall, 50 N. D. 723, 197 N. W. 866, this court held that the rules governing trials in civil actions apply to this kind of proceedings [citation], and State v. Pickering, 29 S. D. 207, 136 N. W. 105, 40 L. R. A. (N. S.) 144, holds such action is a civil proceeding. * * * Even in states which hold that the action is quasi criminal it is in fact and in nature a civil action. Since the proceeding is governed by the law in relation to civil actions it follows that the defendant might be called for cross-examination."

The next point raised is that the court erred in directing the plaintiff in error to answer this question "Do you know this girl, Ruby Wakimoto [the complaining witness]?" The attorney for the plaintiff in error objected to the question on the ground that if the question were answered he "may lend himself to possible self-incrimination through a series of events, without being specifically asked by the prosecution if he fathered this child * * * ." The

court overruled the objection, answering counsel's citation of a number of decisions dealing with communist activities which ruled that a question, though not in itself specifically self incriminating the witness, may be one link in a chain of possible self incrimination by saying: "The Court's recollection of those cases is that the gist of the case is something in the nature of a conspiracy or an association or combining together of people for a certain allegiance, to undermine or subvert the government. It takes a good deal more than a conspiracy to have a child. It takes a little more than knowledge to beget a child. The objection will be overruled."

According to the brief of the plaintiff in error, the claim of privilege was made "because of reasonable fear of incrimination under the laws of Hawaii relating to sex offenses, especially under Sections 11657, 11658 and 11680, Revised Laws of Hawaii, 1945." These relate respectively to the offense of adultery, the punishment therefor, and seduction by willful falsehood or deceit or under promise of marriage. The contention was made that to answer the question would expose Lanier to criminal prosecution for sex offenses under these laws.

The rule against self incrimination has been law in England for many years. The early English cases show that the principle was well founded that in no case, whether civil or criminal, can a witness (in the absence of an immunity statute or its equivalent) be compelled to give an answer *that may incriminate or tend to incriminate him.* In fact, it has been said: "The maxim of *Nemo tenetur seipsum accusare* was so firmly entrenched in English law that the framers of our own constitution evidently did not deem it necessary to specifically declare it as to civil cases where only private interests were at stake and the incriminating facts were desired only in order to establish a civil authority for the benefit of a private party.

But it was deemed essential to declare the rule in criminal cases for the purpose of negativing the right of the state itself to elicit such information even in the administration of the criminal law which affects the public at large." (*Karel* v. *Conlan*, 155 Wis. 221, 234.)

That there was no doubt as to this rule in civil cases and that the constitutional provision related to criminal cases was inserted out of an abundance of caution against the State itself seeking to elicit such information is shown by the statement of Mr. Chief Justice Marshall in the proceedings against Aaron Burr (*In re Willie*, 25 Fed. Cas. No. 14,692e, pp. 38, 39) as follows: "When two principles come in conflict with each other, the court must give them both a reasonable construction, so as to preserve them both to a reasonable extent. The principle which entitles the United States to the testimony of every citizen, and the principle by which every witness is privileged not to accuse himself, can neither of them be entirely disregarded."

Nor is there anything novel or applicable to conspiracy offenses, as distinguished from other offenses, in the recent decisions of the federal courts and of the United States Supreme Court that the rule applies where the answer to a question might not in itself be sufficient to convict a man of a criminal offense but is merely one link in a chain of evidence which may be the means of bringing home an offense to the party answering the question.

In *The Queen* v. *Boyes* (1861), 1 B. & S. 311, 329, 330, it is stated: "To entitle a party called as a witness to the privilege of silence, the Court must see, from the circumstances of the case and the nature of the evidence which the witness is called to give, that there is reasonable ground to apprehend danger to the witness from his being compelled to answer. We indeed quite agree that, if the

fact of the witness being in danger be once made to appear, great latitude should be allowed to him in judging for himself of the effect of any particular question. . . . A question which might appear at first sight a very innocent one, might, by affording *a link in a chain of evidence,* become the means of bringing home an offense to the party *answering."* (Emphasis added.)

In a suit for libel, *Rex* v. *Slaney* (1832), 5 Carr & P. 213, a clerk was called and asked who wrote one of the libelous articles. He declined to answer because it might criminate him. Tenterden, C. J., ruled: "He is not bound to do that, because it may be himself. You cannot only not compel a witness to answer that which will criminate him, but that which *tends* to criminate him; and *the reason is this,* that *the party would go from one question to another, and though no question might be asked, the answer of which would directly criminate the witness, yet they would get enough from him whereon to found a charge against him."* (Emphasis added.)

Lord Mansfield, in the case of *Gates* v. *Hardacre* (1811), 3 Taunt. 424, a civil action by an indorsee against the drawer of a bill, refused to compel a witness to answer whether a bill which was sued upon and bore usurious interest had ever been in his possession before, stating: "Your questions go to connect the witness with the bill, and they may be links in a chain."

Our own United States Supreme Court and federal courts have ruled time and time again that the privilege against self incrimination applies alike to a witness in civil and criminal proceedings whenever the answer to a question put to the witness might tend to subject him to criminal liability. As Mr. Justice Brandeis, in *McCarthy* v. *Arndstein,* 266 U. S. 34, 40, in discussing the privilege against self incrimination, said: "The privilege is not

ordinarily dependent upon the nature of the proceeding in which the testimony is sought or is to be used. It applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it. The privilege protects a mere witness as fully as it does one who is also a party defendant." (See also: 58 Am. Jur. 49, 50, and cases cited.)

It happens that a number of recent decisions of the United States Supreme Court and federal courts relate to procedure before grand juries or juries in investigations or trials under the provisions of the Smith Act, but these decisions apply no new principle of law nor does the fact that the offenses relate to conspiracy have any special hearing on the principle against self incrimination. In one of the more recent cases, *Blau* v. *United States*, 340 U. S. 159, one paragraph of the syllabus is as follows: "It is immaterial whether answers to the questions asked would have been sufficient standing alone to support a conviction when they would have furnished a link in the chain of evidence needed in a prosecution of the witness for violation of (or conspiracy to violate) the Smith Act." In sustaining a witness's refusal to answer a question as to whether she knew the officers of the communist party of Colorado or had ever had possession or custody of any of the books or records of such party, page 161 of the opinion carries the following statement of the court: "* * * she reasonably could fear that criminal charges might be brought against her if she admitted employment by the Communist Party or intimate knowledge of its workings. Whether such admissions by themselves would support a conviction under a criminal statute is immaterial. Answers to the questions asked by the grand jury would have furnished a link in the chain of evidence needed in a prosecution of petitioner for violation of (or conspiracy to

violate) the Smith Act. Prior decisions of this Court have clearly established that under such circumstances, the Constitution gives a witness the privilege of remaining silent."

Again, in the recent case of *Hoffman* v. *United States,* 341 U. S. 479, in sustaining a witness's right to refuse to answer questions, the court quotes the *Blau* case, *supra,* that the privilege against self incrimination extends not only to answers that would in themselves support a conviction, but to those that would furnish a link in the chain of evidence needed to prosecute. The court said in the syllabus: "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result."

Among other recent cases to the same effect are *United States* v. *Wiseman,* 111 F. (2d) 260, and *Alexander* v. *United States,* 181 F. (2d) 480.

The constitutional protection against self incrimination "is confined to real danger and does not extend to remote possibilities out of the ordinary course of law." (*Heike* v. *United States,* 227 U. S. 131, 144.)

The leading case on who decides whether an answer to a question might tend to incriminate is *Mason* v. *United States,* 244 U. S. 362, which states: "The Fifth Amendment does not relieve a witness from answering merely on his own declaration or judgment that an answer might incriminate him; whether he must answer is determinable by the trial court in the exercise of its sound discretion; and unless there is reasonable ground, as distinct from a remote or speculative possibility, to apprehend that a direct answer may prove dangerous to the witness, his

answer should be compelled." Mr. Justice Reynolds, who delivered the opinion of the court in this case, quoted at length with approval from *The Queen* v. *Boyes,* 1 B. & S. 311.

The latest case discussing who decides as to whether a question might tend to incriminate a witness is that of *United States* v. *Reynolds,* U. S. Sup. Ct., March 9, 1953, in which Mr. Chief Justice Vinson says: "Too much judicial inquiry into the claim of privilege would force disclosure of the thing the privilege was meant to protect, while a complete abandonment of judicial control would lead to intolerable abuses. Indeed, in the earlier stages of judicial experience with the problem, both extremes were advocated, some saying that the bare assertion by the witness must be taken as conclusive, and others saying that the witness should be required to reveal the matter behind his claim of privilege to the judge for verification. Neither extreme prevailed, and a sound formula of compromise was developed. This formula received authoritative expression in this country as early as the *Burr* trial. There are differences in phraseology, but in substance it is agreed that the court must be satisfied from all the evidence and circumstances, and 'from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious exposure would result.' *Hoffman* v. *United States,* 341 U. S. 479, 486-487 (1951). If the court is so satisfied, the claim of the privilege will be accepted without requiring further disclosure."

We now come to whether, in the light of the various decisions hereinbefore discussed, there is reasonable ground, as distinct from remote or speculative possibility, to apprehend that a direct answer to the question "Do

you know this girl, Ruby Wakimoto?" might tend to incriminate the witness.

On its face, the question as to whether you know a certain individual looks innocuous but, where the same question is as to whether you know a certain member of the communist party, it has been held to be objectionable. What, in principle, is the difference between that question and whether the witness knew a mother bringing the bastardy proceedings?

The trial judge distinguished the instant case from cases where "the gist of the case is something in the nature of a conspiracy or an association or combining together of people for a certain allegiance, to undermine or subvert the government" and remarked that it takes more than a conspiracy to have a child and more than knowledge to beget one.

In reply to this it may be safely asserted that it takes a more intimate knowledge to beget a child with an individual than to form a conspiracy with such person, and that if one would be endangered by knowing a communist he would be doubly endangered by knowing a mother bringing a bastardy paternity proceeding against him.

There is no mysterious magic in a conspiracy trial that differentiates it from other trials, and the ruling that one may not be compelled to answer a question that may prove a link in the chain of evidence need not be rested upon the rulings in the recent Smith Act trials, but we can go back to the statement of Lord Mansfield in *Gates* v. *Hardacre, supra,* and Tenterden in *Rex* v. *Slaney, supra,* whose reasoning is that a party would go from one question to another, the answer to no one of which would directly incriminate the witness but might prove "links in a chain."

So, in the present case, knowing the complaining witness may be the first step in leading the plaintiff in error to a criminal act committed with the complaining witness. Do you know Ruby Wakimoto? Did you go automobile riding with Ruby Wakimoto? (This question was actually asked.) Did you visit her at her house? Did you go into her bedroom and converse with her while there? (A male voice was heard by the neighbors in the complaining witness's bedroom.) Were the lights out in the bedroom? Where would the questions stop? Could he be led to the very bedside itself and stop short only of the act of coitus or has the witness the privilege of refusing to go the first step toward the bed of fornication?

Assuming, as we must, that the privilege against self incrimination was applicable to the question "Do you know this girl, Ruby Wakimoto?" a remaining and more difficult question is: Was the privilege properly claimed?

The record shows that the privilege was not claimed by the witness himself nor does it anywhere appear that he refused to answer any questions on the ground of privilege and was compelled thereafter by the court to answer. The only objection was made by counsel.

The majority of the cases follow the rule that the privilege is an option of the witness and the objections must be taken by him personally on his oath after the question has been asked; that it cannot be raised by a party to the suit in behalf of the witness unless such party is himself the witness in question; and where the party and the witness are identical, the witness's counsel cannot make claim on the party-witness's behalf, though there are decisions to the contrary. (Wigmore, *Evidence,* 3d ed., vol. 8, § 2270 [2], p. 402; Jones, *Evidence,* 2d ed., vol. 6, § 2490, p. 4927; 70 C. J., Witnesses, § 906; 58 Am. Jur., Witnesses, §48.)

There are strong arguments for the minority view. See: *Clifton* v. *Granger,* 86 Iowa 573; *State* v. *Shockley,* 29 Utah 25, 80 Pac. 865.

In *Clifton* v. *Granger, supra,* the court stated: "* * * It is urged that the privilege is personal, and can only be claimed by the witness. Conceding such to be the rule, we think this record shows that the claim was made by the witness. It is not required that she should in person address the court and claim the privilege. It is certainly sufficient if, through her counsel, the court was given to know that the witness did herself claim the privilege."

In *State* v. *Shockley, supra,* the court held that when the witness is also the defendant in the case, his counsel can speak for him, make the proper objections and protect him in his right and immunity from answering questions on cross examination respecting the commission of other crimes by him in no way connected with the case for which he is on trial.

In some jurisdictions it is held that when it appears the witness may be incriminated by answering a question the judge must warn him of his privilege, but most cases hold to the contrary; that the judge may warn him and, very generally, when such a question arises that counsel may request the judge to warn the witness, but there is no compulsion therefor.

While everyone is presumed to know the law, it seems somewhat of an anomaly to require the witness to know more law than the judge or his attorney when his privilege is threatened.

The majority rule goes on the principle that the claim of privilege should be made by him who is under oath. (*State* v. *Kent,* 67 N. W. 1052, 5 N. D. 516.)

In *State* v. *McKay,* 54 N. D. 801, 211 N. W. 435, which has been cited to the effect that a paternity action is not

a criminal one, this same question of privilege arose and the court stated as follows: "* * * the privilege is personal and must be claimed by the defendant in person under the sanctity of his oath. It cannot be claimed by or through his attorney. Not only must the witness claim the privilege in person, but he must state under oath that the answer will tend to incriminate him. State v. Kent, 5 N. D. 516, 67 N. W. 1052, 35 L. R. A. 518. Since the privilege was not claimed by the defendant, the overruling of the objection was not error."

Finally, our own court has ruled on this question in the case of *Republic of Hawaii* v. *Parsons*, 10 Hawaii 601, where it holds that though the court itself frequently advises the witness of his privilege, there is no rule of law that requires the court to apprise the witness of his right not to give self-incriminating evidence and it is not error for the court to fail to do so.

We are constrained to follow the weight of authority and our own Hawaiian decision in this matter and hold that the privilege against self incrimination must be claimed by the witness personally, and in the absence of objection by the witness the trial judge is not bound to instruct the witness as to his privilege.

Inasmuch as the trial judge found that the appellee had proved its case by a preponderance of evidence, and the findings of a trial judge will not be disturbed for any finding depending upon the credibility of witnesses or the weight of evidence, it is unnecessary to discuss the other assignments of error at length.

Appellant's brief argues at length that there was no direct evidence as to sexual relations between the complaining witness and the defendant other than the uncorroborated testimony of the complaining witness herself. From its very nature sexual intercourse is seldom

susceptible to direct proof other than by the testimony of the persons involved. The complaining witness herself is competent to testify as to such matters and did so testify in this case. In the absence of a statute requiring corroboration, the jury, or the judge in jury-waived cases, may find that the defendant is the father of the child upon the sole testimony of the mother providing such testimony is believed to be credible. (10 C. J. S., Bastards, § 94, p. 179.) Our statute requires no such corroboration. Besides, much of the complaining witness's testimony was corroborated by other evidence testified to by other witnesses.

Sustained.

*M. C. Symonds* (*Bouslog & Symonds* and *N. Yoshinaga* on the briefs) for plaintiff in error.

*T. T. Tsukiyama,* Deputy City & County Attorney (*F. A. McKinley,* Acting City and County Attorney with him on the brief) for defendant in error.

### OPINION OF LE BARON, J.
(Concurring in Part.)

I respectfully concur in the majority opinion but only in the result.