909 P.2d 1122

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Paul K. KUPIHEA, Jr., Defendant–Appellant.**

No. 18087.

Supreme Court of Hawai'i.

Jan. 12, 1996.

Chester M. Kanai, on the briefs, Honolulu, for defendant-appellant Paul K. Kupihea, Jr.

Caroline M. Mee, Deputy Prosecuting Attorney, on the briefs, Honolulu, for plaintiff-appellee State of Hawai'i.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

Following a jury trial, defendant-appellant Paul K. Kupihea, Jr. was convicted of Second Degree Murder, in violation of Hawai'i Revised Statutes (HRS) § 707–701.5(1) (1993),[1] and Possession of Firearm By A Person Convicted of Certain Crimes, and Possession of Ammunition By A Person Convicted of Certain Crimes, in violation of HRS § 134–7 (Supp.1992).[2] On appeal, Kupihea contends that: (1) the trial court erroneously accepted a defense witness' assertion of his fifth amendment privilege against self-incrimination; (2) the trial court erred in refusing to allow introduction of evidence of the amount of cash found on the victim's person; and (3) the prosecution's use of hypotheticals and misstatement of the law during its closing argument denied him a fair trial. We disagree and affirm.

## I. BACKGROUND

On March 4, 1992, Kupihea shot and killed Howard Kalai at the intersection of Kopke Street and Wilcox Lane in the City and County of Honolulu. According to the testimony of two eyewitnesses, Kupihea had arrived at the scene of the shooting just prior to noon in a vehicle driven by Arnold "Bully" Willets. Shortly thereafter, Kalai drove up in a Mustang convertible, in which Willets's girlfriend and a "Japanese guy" were passengers. Willets began arguing with his girlfriend, and Kalai interceded. Kalai and Willets then began arguing, and Kalai hit Willets, knocking him to the ground unconscious.

The prosecution witnesses further testified that, when Kalai turned towards Kupihea, Kupihea backed away. Kupihea then pulled a gun from the back of his shirt and pointed it at Kalai. Kalai, whom the witnesses testified was empty-handed, turned and took several steps away from Kupihea before Kupihea shot Kalai in the back of the head.

During its case in chief, the defense called Willets to testify. However, Willets took the stand out of the presence of the jury, apparently due to his intention to assert his fifth amendment privilege against self-incrimination. We note that, at the time of Kupihea's trial, Willets had been charged, along with Kupihea, with murder in the second degree in a separate incident that had occurred on the same day, prior to the Kalai killing. The victim in that case (identified as Cr. No. 93–1977 [hereinafter, the Ballanon case]) allegedly had been kidnapped from the Kopke/Wilcox intersection and was shot by the same weapon involved in the Kalai shooting.

Under oath, Willets identified himself and Kupihea. When asked about the events of March 4, 1992, he invoked his fifth amendment privilege and refused to answer. The court, at the prosecutor's suggestion, allowed further questioning to determine the extent of Willets's assertion of privilege. Willets refused to answer any questions about the Kalihi area, the intersection of Kopke Street and Wilcox Lane, whether he had been there

---

1. HRS § 707–701.5(1) provides in relevant part that "a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person."

2. HRS § 134–7 provided in relevant part:

     . . . .

     (b) No person who is under indictment for, or has waived indictment for, or has been convicted in this State or elsewhere of having committed a felony, or any crime of violence, or an illegal sale of any drug shall own, possess, or control any firearm or ammunition therefor.

     . . . .

     (g) Any person violating subsection ... (b) shall be guilty of a class C felony; provided that any felon violating subsection (b) shall be guilty of a class B felony. . . .

at the time of the Kalai shooting, or any other questions regarding that incident.

Defense counsel then moved for a mistrial, arguing that although Willets's claim might arise from the Ballanon case, in which Willets and Kupihea were charged as co-defendants, "there's no fifth amendment privilege for Arnold Willets to take on my direct examination" because Willets had no culpability in the Kalai shooting. The prosecutor explained:

Your Honor, for the record, Mr. Willets is charged with Murder II and he's co-defendant with Kupihea in a separate incident, another murder which took place six to twelve hours prior to the Kalai murder. And as far as that case, it's still pending trial.... It involved the same weapon that was used in the Kalai shooting. And so there is—and also, it involved the—there's a kidnapping charge also. The victim in that case was kidnapped from that same location, the intersection of Kopke and Wilcox just after midnight. It would have been March 3rd—or March 4th, I'm sorry, '92, and it's the State's position that it was Mr. Willets and Mr. Kupihea who did that. And [the] victim was a few hours later found dead.

In denying Kupihea's motion for mistrial, the circuit court stated:

This witness has invoked the Fifth Amendment right not to self-incriminate himself and this Court will accept his plea.... I am unaware of any authority by which I can compel this witness to testify or to compel the prosecutor to seek immunity.

What I will do, though, I will allow the defense attorney to resubmit either a memorandum or argument if you find there's authority to have this witness recalled. I will require a memorandum with points and authorities prior to granting of this witness to be recalled.[3]

. . . .

The Court believes that the questions placed the witness at the scene and during the alleged confrontation are sufficient for him to raise the suspicions of the prosecutor and could lead to the formation of an indictment, and the Court believes there's a multitude of reasons why this witness would not want to testify.

In his defense, Kupihea relied on the theories of self-defense, extreme mental and emotional disturbance, and recklessness. He called Evidence Specialist Pia Ryan and tried, unsuccessfully, to have her testify that $2,300 in cash was found in a wallet in Kalai's underwear. Defense counsel argued that:

we are going to be able to argue[,] based on the totality of the evidence[,] that in all likelihood he [ (Kalai) ] had a lot of cash because he was a drug dealer who was armed and dangerous. And we can make this argument in our claims of self-defense [and] in terms of our claim of manslaughter. It goes to our defense.

Although the circuit court ruled that evidence of the $2,300 cash was irrelevant, the court stated: "I am not precluding you from testimony of what he [ (Kupihea) ] knew or thought. But I don't think there is any nexus between money and being a drug dealer or drug dealer and firearm."

Kupihea testified that he had known Kalai for about five years, and that, during that time, Kalai had been unemployed. According to Kupihea, Kalai's income was derived from selling cocaine and "ice," which Kupihea admitted having himself bought from Kalai. Kupihea stated that, on several occasions, he had seen Kalai carrying large amounts of cash and that Kalai carried a gun, either on his person or in his car. Kupihea also testified to a prior incident, corroborated by two witnesses, during which Kalai had "false-cracked" (*i.e.*, struck) Kupihea, apparently unprovoked.

Regarding the events on March 4, 1992, Kupihea testified that Willets was arguing with his girlfriend and yelling something about a black bag. Hoping to mollify Willets, Kupihea went to Kalai's car to see if he could locate the bag. While there, he saw a gun between the console and the seat. He then heard a "pop," and, when he turned to look, Willets was on the ground. Kupihea testified that he thought Kalai had shot Willets and that he saw a gun in Kalai's hand.

---

**3.** There is no indication in the record that such a   memorandum was ever submitted.

Kalai then turned to Kupihea and began threatening him. Afraid that Kalai would shoot him, Kupihea grabbed the gun from Kalai's car. Kupihea stated that, as Kalai advanced on him, threatening and pointing a gun, Kupihea lifted the gun he had just retrieved from Kalai's car. As he turned, trying to take cover, the gun went off. Kupihea maintained that he was not looking at Kalai when he shot, but apparently Kalai turned at the same time as Kupihea did and was shot in the back of the head. No gun, other than that used by Kupihea, was recovered from the scene.

In addition to approving instructions regarding self-defense, the court had also approved instructing the jury on reckless manslaughter as well as the mitigating defense of extreme mental and emotional disturbance. During its closing argument, the prosecution undertook to illustrate the concept of recklessness by utilizing examples of a drunk driver who collides with another vehicle and a person who fires a shot at the ground with many people around. The prosecution also posed the following hypothetical situation to explain the law on "extreme mental or emotional disturbance" manslaughter:

> We have someone who is a battered wife, repeatedly abused. Say she gets abused one last time.... And she lashes back. She is suffering from, in this particular instance, an extreme mental or emotional disturbance. There is [sic] extreme circumstances, she lashes back, grabs a knife in the kitchen, and she starts stabbing, boom, boom, boom, boom.
>
> ....
>
> In that instance, there may be a reasonable explanation for her state of mind, the extreme mental and emotional disturbance. In that instance you might mitigate the murder. A complete loss of control, self control.

Defense counsel objected to the use of hypotheticals, in general, and, in particular, asserted that the prosecutor misstated the law with respect to extreme mental and emotion-

al disturbance. The objections were overruled.

The jury returned verdicts of guilty on each count charged. The judgment of conviction was filed on April 22, 1994, and this timely appeal followed.

## II. DISCUSSION

### A. The Court Did Not Err in Accepting Willets's Assertion of Fifth Amendment Privilege.

■ Kupihea claims that the circuit court erred by allowing Willets to assert a claim of fifth amendment privilege against self-incrimination without properly analyzing whether the testimony would, in fact, tend to incriminate Willets.[4] Whether a trial court should compel a witness to testify over the witness's assertion that his answer might tend to incriminate him or her is a matter within the sound exercise of its discretion, *Territory v. Lanier*, 40 Haw. 65, 72 (1953), and is thus reviewed for an abuse of discretion. "The circuit court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." *Kaneohe Bay Cruises, Inc. v. Hirata*, 75 Haw. 250, 251, 861 P.2d 1, 3 (1993). "The burden of establishing abuse of discretion is on appellant, and a strong showing is required to establish it." *State v. Estencion*, 63 Haw. 264, 267, 625 P.2d 1040, 1043 (1981) (citations omitted).

■ Article I, section 10 of the Hawai'i Constitution, which is virtually identical to the fifth amendment to the United States Constitution, provides in pertinent part that "[n]o person shall ... be compelled in any criminal case to be a witness against oneself." This court examined the origins of the privilege and the values it protects in *State v. Miyasaki*, 62 Haw. 269, 614 P.2d 915 (1980), and explained that:

> Though cast in terms susceptible of a narrow reading that might have severely limited the situations in which it could be asserted, our courts ... have not stood for

---

4. Kupihea apparently does not appeal the circuit court's denial of defendant's motion for mistrial based upon Willets's refusal to testify.

a narrow constitutional construction of the Fifth Amendment based on a literal reading of the language in the light of its historical origins.

*Id.* at 275, 614 P.2d at 919 (footnote and internal quotation marks omitted). It was established more than a century ago that the privilege is not limited to an accused testifying at his or her own criminal trial, but applies to testimony of any witness at any proceeding, where the testimony might tend to show that the witness had committed a crime.

> It is impossible that the meaning of the constitutional provision can only be, that a person shall not be compelled to be a witness against himself [or herself] in a criminal prosecution against himself [or herself]. It would doubtless cover such cases; but it is not limited to them. The object was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself [or she herself] had committed a crime. The privilege is limited to criminal matters, but it is as broad as the mischief against which it seeks to guard.

*Counselman v. Hitchcock,* 142 U.S. 547, 562, 12 S.Ct. 195, 198, 35 L.Ed. 1110 (1892). Moreover, "the privilege against self incrimination extends not only to answers that would in themselves support a conviction, but to those that would furnish a link in the chain of evidence needed to prosecute." *Lanier,* 40 Haw. at 72 (citing *Hoffman v. United States,* 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951)).

▆▆▆▆ The privilege does not protect against "remote possibilities [of future prosecution] out of the ordinary course of law," *id.,* but is "confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." *Hoffman,* 341 U.S. at 486, 71 S.Ct. at 818 (citation omitted). It is the province of the trial court to determine whether such reasonable cause exists.

> The witness is not exonerated from answering merely because he [or she] declares that in so doing he [or she] would incriminate himself—his [or her] say-so does not of itself establish the hazard of

incrimination. It is for the court to say whether his [or her] silence is justified, *Rogers v. United States,* 340 U.S. 367 [,71 S.Ct. 438, 95 L.Ed. 344] (1951), and to require him [or her] to answer if "it clearly appears to the court that he [or she] is mistaken." *Temple v. Commonwealth,* 75 Va. 892, 899 (1881).

*Id.* Judicial inquiry into the basis for invoking the privilege is inherently problematic. "Too much judicial inquiry into the claim of privilege would force disclosure of the thing the privilege was meant to protect, while a complete abandonment of judicial control would lead to intolerable abuses." *Lanier,* 40 Haw. at 73 (quoting *United States v. Reynolds,* 345 U.S. 1, 8, 73 S.Ct. 528, 532, 97 L.Ed. 727 (1953)). The formula adopted by the *Hoffman* Court, which remains viable today, *see, e.g., State v. Hobble,* 126 Wash.2d 283, 892 P.2d 85, 90 (1995); *United States v. Tsui,* 646 F.2d 365, 367 (9th Cir.1981), *cert. denied,* 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982), is that:

> [t]o sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim "must be governed as much by his [or her] personal perception of the peculiarities of the case as by the facts actually in evidence."

*Hoffman,* 341 U.S. at 486–87, 71 S.Ct. at 818 (citation omitted).

The "peculiarities" in this case support the circuit court's acceptance of Willets's claim of privilege. Willets had been charged as a co-defendant with Kupihea in another killing, which occurred six to twelve hours before the Kalai killing. The victim in the earlier killing, Ballanon, had allegedly been kidnapped from the same corner where the Kalai killing occurred and was shot with the same weapon that Kupihea used to kill Kalai. The Ballanon case was awaiting trial at the time Willets invoked his privilege against self incrimination in this case. Furthermore, the prosecution had not offered any immuni-

ty for Willets's testimony in Kupihea's trial for the Kalai killing.

■ Kupihea argues, essentially, that, because Willets could not possibly incriminate himself in the *Kalai* killing, his testimony at Kupihea's trial was not within the protection of the constitutional privilege. Kupihea maintains that the fact that Willets's testimony regarding the Kalai shooting could incriminate him in the Ballanon case is "nonsense," because "[t]he Ballanon shooting was an entirely different matter and was prosecuted under a separate indictment and criminal number." Kupihea apparently misapprehends the scope and application of the fifth amendment privilege. The privilege against self incrimination is broader than Kupihea perceives. The question is not whether a witness's testimony may tend to incriminate him in the criminal proceeding in which he is testifying. It is, rather, whether a witness' testimony in *any* proceeding might later subject the witness to criminal liability. *See, e.g., Lefkowitz v. Cunningham,* 431 U.S. 801, 805, 97 S.Ct. 2132, 2135–36, 53 L.Ed.2d 1 (1977).

In Willets's case, the prospect of future criminal prosecution was more than a remote possibility; he was already being prosecuted for the Ballanon shooting. It is hard to imagine what testimony he could have provided on Kupihea's behalf that would not have had some tendency to provide a "link in the chain" of evidence against him in the Ballanon killing. Testifying at Kupihea's trial and answering defense counsel's questions would have placed Willets with his co-defendant, Kupihea, at the scene of the Ballanon kidnapping only hours afterward. It could also have connected him to the weapon used in the Ballanon shooting.

Given the circumstances, allowing Willets's claim of privilege was not beyond the bounds of reason or in disregard of the law. Nor has Kupihea even attempted to demonstrate substantial detriment, as he must to establish an abuse of discretion. It is difficult to conclude that the absence of Willets's testimony impaired Kupihea's case.

By all accounts, when Kupihea shot Kalai, Willets was unconscious on the ground. Kupihea, himself, testified that he thought Wil-

lets had been shot "[b]ecause he was on the ground, out." Kupihea also testified that when he saw Willets later that day, "[Willets] told me I killed [Kalai]. I told him I never mean to do that, [i]t was just one self-defense, you seen what happened. [Willets] said, [']I never seen nothing.['] That was it. That's all he said."

Based on the foregoing, we hold that Kupihea has failed to establish that the circuit court abused its discretion by accepting Willets's fifth amendment claim of privilege.

### B. *The Amount of Cash Found on Victim's Person was Irrelevant.*

■ Kupihea next asserts that the circuit court erred by ruling that the evidence that Kalai was found to have $2,300 in cash on his person after the shooting was irrelevant and thus inadmissible.

> [D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard.

*Kealoha v. County of Hawaii,* 74 Haw. 308, 319, 844 P.2d 670, 676, *reconsideration denied,* 74 Haw. 650, 847 P.2d 263 (1993). Where the evidentiary ruling at issue concerns admissibility based on relevance, under Hawaii Rules of Evidence (HRE) Rules 401 and 402, the proper standard of appellate review is the right/wrong standard. *See State v. Toro,* 77 Hawai'i 340, 347, 884 P.2d 403, 410 (Haw.Ct.App.), *cert. denied,* 77 Hawai'i 489, 889 P.2d 66 (1994).

■ HRE Rule 402 provides in pertinent part that "[e]vidence which is not relevant is inadmissible." "Relevant evidence" is defined in HRE Rule 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Stated alternatively, evidence is relevant if it possesses a "legitimate tendency to establish a controverted fact." *State v. Ire-*

*baria,* 55 Haw. 353, 356, 519 P.2d 1246, 1249 (1974) (citation omitted).

■ Although frequently articulated as a single determination, the relevance inquiry requires a two-step analysis: (1) is the fact for which the evidence is proffered "of consequence to the determination of the action"; and (2) does the proffered evidence tend to alter the probability of that fact. Evidence is relevant only if both prongs are satisfied. Notwithstanding that the evidence may tend to make a fact more probable, if the fact is not of consequence to the determination, the evidence is irrelevant.

In *State v. Pinero,* 75 Haw. 282, 859 P.2d 1369 (1993), for example, the defendant was convicted of first degree murder for the killing of a police officer "arising out of the performance of official duties." [5] The defendant sought to adduce evidence that the officer did not have a search warrant and so was not in "the performance of official duties." The trial court found that the evidence was arguably relevant, but excluded it under HRE Rule 403.[6] On appeal, this court upheld the ruling, but also held that the evidence was irrelevant. "The question is not whether [the officer] was performing his duties properly, but whether [the defendant] believed that [the officer's] actions were prompted by his official duties." *Id.* at 289, 859 P.2d at 1373. In other words, even though the proffered evidence would tend to establish that the search was not authorized, the propriety of the search was not a fact of consequence to the determination of the action. *See also State v. Malufau,* 80 Hawai'i 126, 906 P.2d 612 (1995) (testimony that injury would have caused serious permanent disfigurement if left unattended irrelevant in assault trial because fact of consequence was whether such disfigurement actually resulted); *Kealoha,* 74 Haw. at 322, 844 P.2d at 677 (because Hawai'i does not recognize a common law tort duty for a motorcyclist to wear a helmet, evidence that an injured motorcyclist was not wearing a helmet irrelevant to show contributory negligence); *Johnson v. Raybestos–Manhattan, Inc.,* 69 Haw. 287, 740 P.2d 548 (1987) (state-of-the-art evidence not admissible to establish whether manufacturer knew or should have known of the danger of the product because manufacturer's knowledge is not fact of consequence in strict products liability action). *Cf. State v. Alston,* 75 Haw. 517, 542, 865 P.2d 157, 169 (1994) (evidence of defendant's statements, although not communicated to complaining witness, was relevant as direct evidence of material element of terroristic threatening).

In this case, the circuit court ruled that the evidence of the wallet and cash discovered after the shooting was irrelevant because it did not increase the probability that the victim, Kalai, was a drug dealer who carried a weapon at the time of the shooting. Although that conclusion may be arguable, it is beside the point because it is Kupihea's state of mind at the time of the shooting and the reasonableness thereof that is the fact of consequence to the determination of the action. The theory of Kupihea's defense was that he was justified in using deadly force, or did so under an extreme mental or emotional disturbance, because he saw a gun in Kalai's hand and believed that Kalai was going to shoot him. Had Kupihea asserted, instead, that he believed Kalai was carrying a *concealed* weapon and that he believed Kalai was about to reach for that weapon to shoot him, we might conclude that the amount of cash was relevant to a fact of consequence. However, under Kupihea's theory as propounded at trial, we believe the evidence was irrelevant to any fact of consequence.

■ The facts that are of consequence to self-defense and "extreme mental or emotional disturbance" manslaughter (EMED

---

5. HRS § 707–701(1)(b) (1993) provides that "[a] person commits the offense of murder in the first degree if the person intentionally or knowingly causes the death of ... [a] peace officer, judge, or prosecutor arising out of the performance of official duties."

6. HRE Rule 403 (1993) provides that:
   Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

manslaughter)[7] are found in the applicable statutes. *See Alston,* 75 Haw. at 540–41, 865 P.2d at 168–69. HRS § 703–304(2) (1993) provides that "[t]he use of deadly force is justifiable under this section if the actor believes that deadly force is necessary to protect himself [or herself] against death, serious bodily injury, kidnapping, rape, or forcible sodomy." HRS § 703–300 (1993) defines "believes," within the meaning of chapter 703, as "reasonably believes." HRS § 707–702(2) (1993) provides that

> [i]n a prosecution for murder in the first and second degrees[,] it is a defense, which reduces the offense to manslaughter, that the defendant was, at the time he [or she] caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. *The reasonableness of the explanation shall be determined from the viewpoint of a person in the defendant's situation under circumstances as he [or she] believed them to be.*

(Emphasis added.)

The facts of consequence to the determination of self-defense or EMED manslaughter all concern the actor's state of mind: (1) whether the actor reasonably believed that deadly force was necessary; and (2) whether the actor reasonably believed that he or she was threatened with one of the specified harms; or (3) whether he or she was under the influence of extreme mental or emotional disturbance; and (4) whether there is a reasonable explanation for the extreme mental or emotional disturbance.

Kupihea's *belief* that Kalai was about to shoot him, and the reasonableness of that belief, are facts of consequence both to self-defense and EMED manslaughter. Kupihea's theory of self-defense and "extreme mental or emotional disturbance" was supported by his own testimony that he saw Kalai with a gun in his hand and that Kalai turned and pointed the gun at him. Such testimony was probative of facts of consequence, that is, Kupihea's reasonable belief that deadly force was necessary because he

was threatened with death or serious bodily injury, or that he was under the influence of an extreme mental or emotional disturbance for which there was a reasonable explanation.

Even if we were to make the inferences urged by Kupihea that (1) the cash increased the probability that Kalai was a drug dealer, which, in turn, (2) increased the probability that Kalai was carrying a concealed weapon, we emphasize that, under the theory advanced by Kupihea at trial, the issue was whether Kupihea's belief that Kalai had a gun *in his hand and was about to shoot him* was reasonable. The amount of cash concealed on Kalai's person had no tendency to affect the probability of that belief or its reasonableness, especially where Kupihea admitted that he was unaware of the concealed cash at the time.

We therefore hold that the circuit court was "right" in excluding the evidence of the cash because, under Kupihea's defense as propounded at trial, the evidence was irrelevant.

### C. *No Prosecutorial Misconduct Requiring Reversal*

Finally, Kupihea claims that the use of hypothetical examples outside the scope of the evidence and a misstatement of the law during the prosecutor's closing argument were reversible error. "Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." *State v. McGriff,* 76 Hawai'i 148, 158, 871 P.2d 782, 792 (1994) (citing *State v. Pemberton,* 71 Haw. 466, 476, 796 P.2d 80, 85 (1990)). "In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, [the reviewing court] consider[s] the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against [the] defendant." *State v. Agrabante,* 73 Haw. 179, 198, 830 P.2d 492, 502 (1992) (citing *State v. Senteno,* 69 Haw. 363, 366, 742 P.2d 369, 372 (1987)).

---

**7.** Although Kupihea also relied on the theory of reckless manslaughter, we assume the evidence of the amount of cash on Kalai's person was not proffered in support of that theory because such evidence has no logical relevance to whether Kupihea acted recklessly.

There are two types of misconduct alleged. First, Kupihea complains that the prosecutor's use of hypothetical examples was improper and that, therefore, his objections were erroneously overruled. This court has not ruled on the propriety of hypothetical examples to illustrate legal principles during closing argument, and Kupihea cites no authority proscribing such arguments. Several courts that have considered the issue have ruled that, although arguably improper, the use of hypothetical illustrations was not prejudicial.

In *People v. Pietrzyk*, 54 Ill.App.3d 738, 12 Ill.Dec. 285, 369 N.E.2d 1299 (1977), involving a prosecution for aggravated battery and battery, the defendant objected to the following hypothetical used in the prosecutor's closing argument:

For instance, if you were to tackle a man, when he is tackled you were to kick him, if you were to punch him and you were to stab him and cause him great bodily harm, you are guilty of aggravated battery and all the rest of you are [guilty] because you aided and you abetted.

*Id.* at 291, 369 N.E.2d at 1305. The court held that, because the hypothetical did not misstate the law and the jury was given proper instructions on accountability, "[i]f it could be said that the jury was mislead by the hypothetical example, that misconception was removed by the court's instructions." *Id.* at 292, 369 N.E.2d at 1306 (citation omitted); *see also State v. Smith*, 675 P.2d 521, 527 (Utah 1983) (hypotheticals used as examples of "depraved indifference" were not misleading and were posed as examples, not decided cases); *People v. Wharton*, 53 Cal.3d 522, 280 Cal.Rptr. 631, 659, 809 P.2d 290, 318 (1991) (prosecutor's use of battered wife hypothetical to explain "heat-of-passion" murder, even if arguably misconduct, could not possibly have prejudiced defendant), *cert. denied*, 502 U.S. 1038, 112 S.Ct. 887, 116 L.Ed.2d 790 (1992).

Kupihea has failed to show how the use of hypothetical examples illustrating manslaughter prejudiced him. The scenarios posed by the prosecutor were not represented as being anything other than hypothetical and were confined to the law on which the jury would be instructed. Kupihea, however, contends that one such hypothetical misstated the law on extreme mental or emotional disturbance manslaughter.

During the prosecutor's closing argument, the following exchange took place:

[The PROSECUTOR]: For example, this is just a hypothetical, but you maybe have a battered wife, repeatedly—

[Defense objection, overruled]

[The PROSECUTOR]: We have someone who is a battered wife, repeatedly abused. Say she gets abused one last time. Last straw. She gets beaten. And she lashes back. She is suffering from, in this particular instance, an extreme mental or emotional disturbance. There is [sic] extreme circumstances, she lashes back, grabs a knife in the kitchen, and she starts stabbing, boom, boom, boom, boom.

[Defense objection.]

THE COURT: Counsel, I believe in giving pretty much wide discretion with the attorneys during their closing arguments. Let's, of course, remind the jury that what the attorneys are saying is not evidence. Objection is overruled.

[The PROSECUTOR]: In that instance, there may be a reasonable explanation for her state of mind, the extreme mental and emotional disturbance. In that instance, you might mitigate the murder. *A complete loss of control, self-control.*

[DEFENSE COUNSEL]: Your Honor, I'll object. That misstates the law.

(Emphasis added.)

Kupihea argues that "it is error to say the mental or emotional disturbance must result in the total loss of self-control." However, taken in context, we do not believe that is what the prosecutor said. The prosecutor did not indicate that it was always necessary for the loss of control to be complete, but rather that, in the circumstance of the hypothetical, the loss happened to be complete.

██ Moreover, even if the use of hypotheticals was arguably improper, this court has repeatedly held that improper comments by a prosecutor can be cured by the court's instructions to the jury and that it will be

presumed that the jury adhered to the court's instructions. *Agrabante,* 73 Haw. at 199, 830 P.2d at 502; *State v. Melear,* 63 Haw. 488, 497, 630 P.2d 619, 626 (1981); *State v. Kahalewai,* 55 Haw. 127, 129, 516 P.2d 336, 338 (1973).

In this case, the jury was cautioned more than once that counsel's remarks were not evidence. First, in response to Kupihea's objection, the court stated, "Let's, of course, remind the jury that what the attorneys are saying is not evidence." Later, during the defense's closing argument, Kupihea's attorney specifically refuted any impression that extreme mental or emotional disturbance manslaughter required a total loss of self-control. On rebuttal, the prosecutor cautioned the jury that it should look to the judge's instructions alone, and not the arguments of counsel, to determine the law. Finally, the jury was properly instructed on the law of extreme mental or emotional disturbance manslaughter and, again, instructed that "[a]nything said by the attorneys is not evidence. You should consider what they have said to you but you are not bound by what they remember or how they see the evidence."

Based upon the applicable factors, we hold that Kupihea has failed to show that the prosecutor's conduct prejudiced his substantial rights and deprived him of a fair trial.

## III. *CONCLUSION*

For the foregoing reasons, we affirm the judgment of conviction.