**Electronically Filed
Supreme Court
SCWC-15-0000329
18-JUN-2020
02:10 PM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I, Respondent/Plaintiff-Appellee,

vs.

YOKO KATO, Petitioner/Defendant-Appellant.

SCWC-15-0000329

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-15-0000329; CR. NO. 13-1-1641)

JUNE 18, 2020

McKENNA, POLLACK, AND WILSON, JJ., WITH NAKAYAMA, J.,
DISSENTING, WITH WHOM RECKTENWALD, C.J., JOINS

OPINION OF THE COURT BY POLLACK, J.

The circuit court in this case precluded the defendant from presenting third-party culpability evidence because it determined that the proffered evidence failed to establish a "legitimate tendency" that the third party committed the crime. In this opinion, we reexamine the "legitimate tendency" test in light of the Hawai'i Rules of Evidence (HRE) and subsequent decisions of jurisdictions whose decisions were considered when

this court adopted the test. We conclude from our review that admissibility of third-party culpability evidence is properly governed by HRE Rules 401 and 403, without having to also satisfy a legitimate tendency test. We additionally conclude that the circuit court erred by excluding the defendant from presenting third-party culpability evidence at trial, evidence that was fundamentally important to the defendant receiving a fair trial in this case. Inasmuch as the defendant's right to present her defense was prejudicially affected by the circuit court's error, the error was not harmless beyond a reasonable doubt. We also address other contentions raised by the defendant as certain of these issues may arise on remand.

Accordingly, we vacate the conviction in this case, and the case is remanded to the circuit court for further proceedings consistent with this opinion.

## I.   BACKGROUND AND CIRCUIT COURT PROCEEDINGS

Yoko Kato was arrested in connection with a stabbing that occurred on October 25, 2013, in the Diamond Head area of Honolulu, on the island of O'ahu. She was subsequently charged by complaint in the Circuit Court of the First Circuit (circuit court) with attempted murder in the second degree in violation of Hawai'i Revised Statutes (HRS) §§ 705-500, 707-701.5,[1] and

---

[1]     HRS § 707-701.5 (1993) provides in pertinent part as follows:

(continued . . .)

2

706-656.  Kato pleaded not guilty to the charge and a jury trial was held.[2]

### A. State's Case at Trial

### 1.  Complaining Witness

The complaining witness (CW), a Japanese national, testified through a Japanese-English interpreter as follows.

In the fall of 2013, she was living in Hawai'i to study English.  During this time, she met and began a romantic relationship with David Miller, a Caucasian janitor at the Shinnyo-en Temple that she attended.  Because she did not have a permanent residence, she moved in with Miller for about a month in August 2013, and Miller arranged for her to stay with his ex-girlfriend Yoko Kato, a Japanese national, from October 12 through 13, 2013.  While staying with Kato, Kato spoke to the CW about her past relationship with Miller.  After staying at Kato's house, the CW had no contact or very limited contact with Miller and broke up with him.

---

(. . . continued)

(1) Except as provided in section 707-701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.

[2]     The Honorable Karen S.S. Ahn presided over the proceedings in this case.

While in Hawai'i, the CW used the LINE application (LINE app), an internet application frequently used by Japanese nationals, to communicate with friends and organize outings. To contact someone on the LINE app, users either put their LINE identifications (LINE ID) directly into another user's LINE app or users must know the LINE ID of the other user they want to contact. Although the CW never gave Kato her LINE ID, Kato contacted her on the LINE app to request that she return a key that belonged to Miller's bicycle.

Shortly after moving out of Kato's apartment, the CW received a LINE message from an Ai Akanishi asking her to meet and have drinks. The CW did not know Akanishi, who claimed to have gotten the CW's LINE ID from "other people." Despite feeling that the situation was odd, she agreed to have drinks with Akanishi and Akanishi's boyfriend because Akanishi said that she was a Japanese student studying English like the CW. The CW agreed to meet Akanishi for drinks at Akanishi's boyfriend's house on October 25, 2013, on Kaunaoa Street.

On that day, the CW biked to Kaunaoa Street to meet Akanishi and arrived at around 9:45 p.m. A man was sitting down on a bench when she arrived, and he directed her, in poor Japanese, to a dark corner where she could park her bicycle. The man was wearing a short sleeved shirt, pants, and a baseball hat, had brown colored arms and neck, and appeared to be Asian.

When he asked her name, his Japanese did not sound good; according to the CW, it was "Japanese spoken by a nonnative speaker."

While the CW was walking her bike to the dark corner, the man stabbed her multiple times in the arm, back, and abdomen with a knife. She screamed and began running away with the man chasing her. The CW ran into the Diamondhead Coffee Bean and Tea Leaf shop, and the employees called the Honolulu Police Department (HPD). She was taken to the hospital, where she spoke to HPD Officer Gilbert Trevino in Japanese. The CW described the clothing that the assailant was wearing, and she told the officer the height of her attacker in centimeters, which he converted to 5'9".

In an interview with Detective (Det.) Nakama on October 27, 2013, she described the person who stabbed her as a male. The next day, she told Det. Nakama that the assailant could have been a woman, and that the voice was high for a male.

In describing her injuries, the CW stated that she could no longer use her arm fully and still had scars from the knife wounds and post-stabbing surgeries.[3] The CW testified that she did not believe that Miller was the individual who stabbed

_____

[3] Dr. David Inouye, an expert in surgery and surgery critical care, testified that he operated on the CW's wounds, that they were caused by a knife, and that the wounds were life threatening.

her because he spoke good Japanese, he did not have a motive, and he did not fit the physical shape of the person who stabbed her. The CW also testified that Kato was not the person who stabbed her.

## 2.   Other Witnesses

Emiko Morie, a woman who lived on Kaunaoa Street, testified through a Japanese-English interpreter that she observed the CW arrive and begin speaking to an individual that Morie believed was a man. Morie stated that she saw the man chase after the CW and fall. When she went to investigate, Morie testified, she discovered a flip phone where the man had fallen. Morie explained that she opened the phone and saw that a call had recently been made to a contact named "David." She stated that she called that contact, and a man answered and offered to retrieve the phone within thirty minutes. Morie said that a middle-aged Japanese woman, whom she later identified as Kato, approached her twenty minutes later and asked for the phone, but she refused to give it to the woman.

Eli Mosher, who was talking with his friend seated outside of his church when the incident occurred, testified that he saw the CW being chased by a man who fell down. He stated that the man was about 5'6" to 5'8" with medium build. Mosher testified that he also described the person as a male in a written statement that he gave to police on the evening of the

incident and when he was interviewed by Detective Nakama two days later. Mosher also said that the person could "possibly" have been a woman, although he acknowledged that he was making that statement for the very first time at trial.

HPD Officer Jonathan Locey related that he responded to the scene and interviewed the CW. He explained that because the CW could not speak Japanese, he was only able to communicate with her through hand signals and English. The officer testified that, based on the CW's statements, the suspected assailant was a Caucasian male, wearing a white or gray T-shirt, jeans, and a black baseball cap. The CW never told him that the attacker was Asian, Officer Locey stated.

HPD Officer William Ellis testified that he was investigating the scene of the incident when he was given a flip phone by Morie, who told him that she found the phone in the general area of the crime scene. Officer Ellis said that he was then approached by a woman who identified herself as "Yuri Mochizuki" and claimed that she lost her phone. The woman was able to describe and unlock the phone, so he gave it to her, the officer stated. The woman did not explain to him how she lost the phone, Officer Ellis testified, and he was unaware that the phone was connected to the incident. After giving her the phone, she went into a gas station to use the restroom and did

not return although she had been requested to do so, the officer stated.[4]

Yui Mochizuki, Kato's roommate at the time of the incident, testified through a Japanese-English interpreter that she saw Kato's ex-boyfriend Miller at the apartment drinking beer with Kato at about 7:30 p.m. on October 25, 2013. Mochizuki explained that she left for a party about that time and got home around 1:30 a.m.; Kato was home and told her that she had lost her phone that night. Kato said that she had found an envelope at the door earlier that night containing $60 and a note written in Japanese with directions on where to find her phone, Mochizuki testified. Kato stated that she had followed the instructions, which said to go to the Coffee Bean and Tea Leaf shop in the Diamond Head area at 9:00 p.m., Mochizuki testified, but when she got there, someone pushed her, causing her phone to fall. After being pushed, Kato said she heard a scream and saw police officers in the area, Mochizuki stated. Mochizuki testified that Kato told her that she believed Miller wrote the note, which contained the words "I love you," but Kato was unsure because the Japanese in the letter was better than

---

[4]     Christopher Lam, a worker at that gas station, testified that Kato came in to use the bathroom around 11:00 p.m. He told Kato that they did not have a public bathroom and she left, Lam stated. Kato was wearing a red shirt and red shorts, Lam testified, and she did not have a knife or blood on her.

Miller's abilities. Mochizuki explained that she had heard Miller speak Japanese poorly, using only words and not complete sentences. Mochizuki testified that she never saw Kato with a knife and did not see any injuries on her on October 25 or 26, 2013.

HPD Det. Roy Nakama, the officer assigned to investigate the case, testified that he reviewed all the reports associated with the case and that based on the information therein, he believed that the suspect was possibly male, slim build, wearing dark clothes, and approximately 5'5" to 5'9" in height. The detective related that, during the CW's interview, the CW, when describing the assailant, stated that "on second thought it could have been a female," "possibly a male or a female," and that Kato might have done this to her. The police thereafter searched Kato's apartment and found her flip phone and an iPod Touch but did not recover any weapons or clothing. When Kato was arrested, Det. Nakama related, she had a bandage over her right knee and bruises on her left knee. Det. Nakama also testified that he interviewed Miller, but that he did not consider Miller to be a suspect, did not check Miller for physical injuries, and did not request his cell phone.

Kristen Hamamoto, a digital forensics examiner, testified that she found LINE app communications between the CW and Akanishi, and between the CW and Kato, on the CW's phone,

but she could not determine what device the Akanishi messages came from.  The examiner explained that she found photos of texts from "David" on Kato's iPhone.  Hamamoto testified that she also found that Kato's iPod either sent or received communications with an email address connected to Akanishi, but she was unable to date those messages.[5]

Richard Sakurai, Anthony Loui, and Hien Ung, who were employed at a security equipment store during October 2013, testified that a woman, whom Sakurai and Ung identified as Kato, came into the store in October and was interested in knives.  Ung stated that Kato purchased a knife from the store; Sakurai and Loui testified that they could not confirm a purchase.

**B.  Defense's Case at Trial**

Kato called David Miller as a witness.  Although all of Miller's testimony was later stricken, as explained below, Miller testified that he met the CW in March or April 2013.  Initially they were just friends but it developed into something more serious, Miller said.  Miller testified that in August 2013, the CW had become his girlfriend and moved into his apartment.  She had to move out on September 1, 2013, Miller

---

[5]     The CW testified that she had not received any messages from Akanishi since the incident.  Reyn Yoshinaga, a special agent with Homeland Security, testified that no one with the name Ai Akanishi entered the U.S. starting from the late 1990s.

explained, and their relationship lasted until about mid-October 2013.  The defense asked Miller if he was aware the CW was dating other men while he was dating her; the State objected as to relevance and its objection was sustained.  The State similarly objected to the defense's next question, asking Miller if he had seen the CW with other men, and again the objection was sustained on relevancy grounds.  Defense counsel requested a bench conference to explain the relevance of his line of questioning.

In the bench conference, defense counsel explained that the defense was attempting to show that Kato did not have a motive to stab the CW whereas Miller did.  Counsel argued that Miller wanted to marry the CW and thus was angry and upset with the CW for dating other men and leaving him, which resulted in his stabbing her.  The State responded that Kato could not bring up evidence of Miller's motive under State v. Rabellizsa, 79 Hawai'i 347, 903 P.2d 43 (1995).  Counsel maintained that there was a sufficient nexus under Rabellizsa because Miller was angry and upset at the CW; the CW was saying that she loved Miller, missed him, and wanted to see him, and "then she just blows him off."  And not only was Miller upset, counsel explained, but he went through the CW's phone, and he "saw these males' names."  The court asked defense counsel if Miller "said I'm going to

kill [the CW]" and when counsel said that he had not, the court stated "Rabellizsa, no nexus."

Following the bench conference, the defense attempted to ask Miller if he had seen the CW with other men, prompting Miller to request a break and the court to excuse the jury and begin another bench conference. The court returned to the Rabellizsa issue. The court evaluated some of the evidence to determine if there was a nexus, noting that "nobody saw [Miller] near the scene," and "nobody says it was a Caucasian." Defense counsel responded that the CW had identified her assailant as a Caucasian to two different police officers. The court replied, "but there's testimony that it's an Asian person." The court then stated that Miller was 5'10" while testimony indicated that the person who assaulted the CW was 5'5" to 5'7". Defense counsel stated that Miller's build was similar to the person who stabbed the CW, and that the estimates of the witnesses varied from perception of height. The court also stated that Miller testified that he was not bothered now that the CW was going out with other men. Defense counsel again noted that Miller went through the CW's cell phone and saw numerous phone numbers of males and was unhappy about her relationships with other men. Additionally, counsel stated, on October 23, 2013, Miller told Kato that the CW was having sex with other men.

Having "heard the evidence," the court held that the defense "had to have some nexus between the other guy and the crime," and that the court didn't "see any here."  The court then turned to Fifth Amendment issues with regard to Miller's testimony.

Prior to trial, Kato had filed a notice of intent (Kato's Motion in Limine #1) to introduce evidence that Miller had physically abused Kato in May 2013, that Miller had been arrested on June 24, 2013, for abuse of a family or household member based on a different incident with Kato,[6] and that Miller had subsequently forced Kato to write a letter recanting her abuse allegations.  Counsel explained that the defense would elicit testimony that in September 2013, Miller had told Kato that she ruined his life and that Miller had threatened to get revenge on her for having him arrested for the abuse offense. The defense's theory was that David Miller set Kato up and was the person who stabbed Kato or arranged it, defense counsel explained to the court.

---

[6]     Miller was subsequently prosecuted for harassment, but the case was dismissed without prejudice because of the prosecution's failure to secure a Japanese interpreter for Kato and for not providing the defense with a 911 tape relating to the offense.

During a pretrial Hawai'i Rules of Evidence (HRE) Rule 104 hearing,[7] Kato had called Miller to ask him questions regarding (1) the evidence proffered in her Motion in Limine #1, (2) questions relating to his relationships with Kato and the CW, (3) questions relating to his Japanese proficiency, and (4) questions relating to his motive to want to stab the CW. Before Miller testified, the defense argued that Miller should not be allowed to take the Fifth Amendment on those questions because, under State v. Kupihea, 80 Hawai'i 307, 909 P.2d 1122 (1996), the chance of his prosecution for harassment, violations of a temporary restraining order (TRO),[8] or the CW's stabbing was "slim to none." The court did not issue a ruling, and Miller was called to testify.

Miller, with the assistance of court-appointed Fifth Amendment counsel, exercised his Fifth Amendment rights in response to defense counsel's questions as to multiple matters. The court ruled that Miller had properly asserted his Fifth

---

[7]     HRE Rule 104(a) (1993) provides, in relevant part:

> Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subsection (b). In making its determination the court is not bound by the rules of evidence except those with respect to privileges.

[8]     A TRO had been issued against Miller, effective June 26, 2013, to December 25, 2013, that prohibited any contact between Miller and Kato, including texts, contact, and phone conversations. It was later amended to allow them to be at the temple at the same time.

Amendment privilege on questions regarding (1) June 24, 2013, the date of his arrest for abuse of family or household member; (2) any contact between himself and Kato from June 26, 2013, to December 23, 2013, as that could expose him to liability for violating the TRO; (3) and questions regarding his conversations with the CW that involved Kato. At this hearing, Miller answered questions relating to his feelings towards the CW before and after their relationship ended,[9] his feelings about the CW dating other men,[10] and the CW's two-day stay with Kato.[11] Miller also testified that he carries a "quick release" knife with a four-inch blade for work.

But at trial, after Kato attempted to ask Miller if he had seen the CW with other men, Miller's court-appointed Fifth Amendment lawyer[12] informed the court that counsel would be instructing Miller, for the first time, to exercise his Fifth

_____

[9] Specifically, Miller testified that he fell in love with the CW and hoped to marry her, although he never communicated this to the CW. Miller also testified that the CW told him that she loved him and would see him soon, before she stopped contacting him. Miller explained that he was not angry at the CW for ending their relationship.

[10] Miller said that he wasn't sure if the CW was seeing other men but that he never saw her with other men. Miller also explained that he was not upset about the CW dating men before him.

[11] Miller stated that he told the CW not to tell Kato that he and the CW were in a relationship. Miller also explained that the CW told him that she never told Kato she was in a relationship with Miller.

[12] Miller's court-appointed counsel at the pretrial hearing and at trial was the Office of the Public Defender, although different attorneys appeared on his behalf at the two proceedings.

Amendment rights to any questions that would "arguably give [Miller] a motive to assault [the CW]." The court then held another HRE Rule 104 hearing during a trial recess because of Miller's intention to exercise the Fifth Amendment to questions he had answered at the pretrial HRE Rule 104 hearing. Kato argued that Miller should be forced to testify because he had already answered these questions with counsel present and because, under Kupihea, the chance of Miller's prosecution for the stabbing of the CW was remote.

At the trial HRE Rule 104 hearing, the court overruled Kato's objections and allowed Miller to invoke the Fifth Amendment on (1) "motive related questions" because Kato was trying to blame Miller for the crime, (2) communications he had with Kato because "it's going to lead directly to [Miller] fixed [the stabbing] up, allegedly," and (3) communications with the CW after she moved out because it would "infer that he had communications with [the CW] up to the 24th" of October, which could furnish a link. The court further permitted Miller to exercise his Fifth Amendment rights on questions he had previously answered, including questions relating to his feelings towards the CW before and after their relationship ended, Miller's feelings about the CW dating other men, the CW's two-day stay with Kato, and whether he owned a knife. The court explained its ruling by noting that Kato was trying to blame

Miller for the stabbing, and thus any questions about his motive could implicate him. The court did not rule on defense's contention that Miller had waived his Fifth Amendment privilege by answering those questions at the pretrial Rule 104 hearing with appointed counsel present, instead remarking, "when there's a change of lawyer, are you stuck with your old assertions of the Fifth, or are you not? I don't know."

In light of the court's ruling, defense counsel argued that much of the information that would be excluded by Miller asserting his Fifth Amendment privileges could not come out through Kato's testimony because it would be excluded as hearsay statements.[13] Kato's right to a fair trial would be violated unless Miller was considered unavailable so that his statements could come in under HRE Rule 804, defense counsel maintained. The court reaffirmed its rulings on Miller's Fifth Amendment privileges but does not appear to have ruled on Kato's argument that eliciting the evidence through Kato would not be viable.

After the court's rulings to essentially preclude all testimony from Miller related to the incident, his prior relations with Kato, and his relationship with the CW, the court convened the jury, and struck all of Miller's trial testimony

---

[13] Kato originally informed the court that she would testify. The court, in rendering its ruling allowing Miller to exercise the Fifth Amendment, stated its assumption that Kato would be able to testify as to what Miller had told her.

with Kato's consent.[14]  Kato exercised her right to remain silent and did not testify; according to defense counsel, Kato made this decision because of the court rulings regarding Miller's exercise of his Fifth Amendment rights.

### B. Jury Instructions and Verdict

During the settling of jury instructions, the court ruled that, under Rabellizsa, Kato could not argue that Miller stabbed the CW, but Kato could argue that someone besides her was the person who stabbed the CW.  The court explained that there was nothing tying Miller to the scene nor did Miller match the physical description of the assailant provided by witnesses. In her closing argument, Kato referenced the fact that the CW and witnesses identified a male suspect, but, complying with the court's ruling, Kato did not argue that it was Miller.

The court instructed the jury on the included offenses of attempted murder in the second degree, including reckless endangering in the second degree.  The jury was not instructed on accomplice liability nor did the parties raise an accomplice liability theory in their closing arguments.[15]

---

[14]    At the close of the State's case, Kato moved for a judgment of acquittal; that motion was denied.

[15]    During the discussion on the defense motion for judgment of acquittal, the court asked if accomplice liability was "involved here."  The State responded that "it could be" and defense counsel answered "I mean, theoretically.  But even that is a stretch. . . .  So either [Kato's] the stabber, or she's not.  She's an accomplice, or not."

During jury deliberations, the jury asked the court if it could "consider whether someone else aided [Kato]?" In response, the court told the jury, "During this trial, you received all of the evidence which you may consider to decide this case. You must follow all of the court's instructions to you." The jury communicated with the court again, stating,

> After deliberating yesterday afternoon and all morning, we are still hung almost 50/50. One major point of confusion is how we interpret the legalese of the charge itself on page 23 of our instruction [for attempted murder in the second degree]. Some of us feel that [Kato] is not guilty because there is reasonable doubt whether [Kato] actually held the knife and stabbed [the CW]. Others feel that there is proof beyond a reasonable doubt that [Kato] took actions to lead [the CW] to Kaunaoa St. where someone was waiting to stab [the CW].
>
> Our question is, in layman's terms, does the charge include [Kato] intentionally conspiring to have [the CW] stabbed without actually _being_ the stabber?

In response to the jury's second question, the court responded "No."

The jury found Kato guilty of reckless endangering in the second degree.[16] Kato was sentenced to one year incarceration with credit for time served, with the jail sentence stayed pending appeal. Kato timely appealed from the circuit court's March 11, 2015 Judgment of Conviction and Sentence (judgment) to the Intermediate Court of Appeals (ICA).

___

[16] HRS § 707-714(1)(a) (Supp. 2012) provides as follows: "A person commits the offense of reckless endangering in the second degree if the person . . . [e]ngages in conduct that recklessly places another person in danger of death or serious bodily injury[.]"

19

## II.   ICA PROCEEDINGS

Kato raised the following four points of error on appeal: (1) the circuit court erred in instructing the jury on reckless endangering in the second degree as a lesser-included offense; (2) there was not substantial evidence for the jury to convict Kato for reckless endangering in the second degree; (3) the court abused its discretion in failing to compel Miller to testify over his assertion of his Fifth Amendment privileges; and (4) the court erred in precluding Kato from adducing evidence that Miller had a motive to commit the crime charged.

The State acknowledged in its answering brief that it failed to convince the jury beyond a reasonable doubt that Kato was the person who stabbed the CW.  The State, while noting that the jury was not instructed on accomplice liability, asserted that it would have been improper to do so as the State did not present accomplice evidence.  The State argued that a reckless endangering in the second degree verdict does not require Kato to have been an accomplice; it merely required the State to prove that Kato had placed the CW in danger of death or serious bodily injury.  As to Miller's Fifth Amendment privileges, the State noted that it did not offer him immunity and therefore the risk of prosecution for violations of the TRO or the CW's stabbing was not remote under Kupihea.  Finally, the State argued that Kato failed to present any evidence linking Miller

to the stabbing of the CW and thus failed to show a legitimate tendency that Miller was the assailant.

The ICA, in its memorandum opinion,[17] stated that the State pursued a theory that Kato was the person who stabbed the CW, but it determined that there was substantial evidence upon which the jury could have found Kato to be an accomplice.[18] Thus, the ICA concluded that it was not error for the circuit court to instruct on reckless endangering in the second degree, and there was sufficient evidence to support Kato's conviction on this offense.

Turning to the circuit court's allowance of Miller's assertion of his Fifth Amendment privilege, the ICA noted that the privilege applies to testimony at any proceeding if it might tend to show the witness committed a crime. The ICA explained that Kato attempted to introduce evidence that would show that

---

[17]  The ICA's memorandum opinion can be found at State v. Kato, No. CAAP-15-0000329, 2019 WL 1253370 (App. Mar. 19, 2019) (mem.).

[18]  The ICA ruling on this issue states as follows:

> In this case, there was substantial evidence upon which the jury could have concluded that Kato, pretending to be someone named "Ai Akanishi," used the LINE application to lure [the CW] to the Kauna'oa Street address where someone – who may or may not have been Kato herself - was waiting there to stab her. Jury Communication No. 2 bears this out, as does the extremely short time - twelve minutes - between the Circuit Court answering the jury's question and the return of the verdict.

(Emphasis added.)

Miller violated a TRO, violation of which was still subject to prosecution at the time of the pretrial motions and trial, as well as evidence that could "furnish a link in the chain of evidence needed to prosecute him" for the CW's stabbing. Accordingly, the ICA held that the court did not abuse its discretion when it did not compel Miller to answer questions after he invoked his Fifth Amendment right against self-incrimination.

In evaluating whether the circuit court erred in precluding evidence of Miller's motive to attack the CW, the ICA stated that, in order to introduce evidence that a third person committed the crime, there must be a nexus between the third person and the commission of the crime, motive evidence alone would be irrelevant and collateral. (Citing State v. Rabellizsa, 79 Hawai'i 347, 349-50, 903 P.2d 43, 45-46 (1995)). The ICA recited certain evidence proffered, namely that the CW described her attacker as a non-native speaker of Japanese and a Caucasian male with a height between 5'4" to 5'8" tall, and weighed the evidence implicating Kato and tending to show that Miller was not the stabber. The ICA noted that there was no evidence connecting Miller to the LINE app or to messages sent by "Ai Akanishi," nor was there evidence that Miller had access to Kato's phone. After evaluating the evidence, the ICA held that the evidence proffered did not have a legitimate tendency to

show that Miller was the person who stabbed CW or that he framed Kato for the attack. Thus, the ICA held that the circuit court did not err in precluding Kato from eliciting evidence of Miller's alleged motive to murder the CW, the ICA held.

The ICA accordingly affirmed the judgment of the circuit court. Kato timely filed an application for writ of certiorari, which this court accepted.

### III. STANDARDS OF REVIEW

### A. Evidentiary Rulings

The standard employed when reviewing the admissibility of evidence varies with the particular evidentiary rule at issue. State v. West, 95 Hawai'i 452, 456, 24 P.3d 648, 652 (2001) (citing Kealoha v. Cty. of Haw., 74 Haw. 308, 319, 844 P.2d 670, 676 (1993)). When a rule is amenable to objective application such that it can result in only one correct answer in a given situation, the lower court's application of the rule is reviewed under the right/wrong standard. Id. The evaluation of whether evidence is "relevant" within the meaning of HRE Rule 401 (1993) falls into this category of determinations, and we are thus not required to give weight to the trial court's application of the rule. State v. St. Clair, 101 Hawai'i 280, 286, 67 P.3d 779, 785 (2003).

## B. Sufficiency of the Evidence

Appellate courts review the sufficiency of the evidence at trial for "substantial evidence." State v. Kalaola, 124 Hawai'i 43, 49, 237 P.3d 1109, 1115 (2010). Substantial evidence in this context is defined as "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Id. Evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction. State v. Batson, 73 Haw. 236, 248, 831 P.2d 924, 931 (1992).

## C. Fifth Amendment Privilege Against Self-Incrimination

"Whether a trial court should compel a witness to testify over the witness's assertion that his answer might tend to incriminate him or her is a matter within the sound exercise of its discretion, and is thus reviewed for an abuse of discretion." State v. Kupihea, 80 Hawai'i 307, 312, 909 P.2d 1122, 1127 (1996) (citation omitted).

## D. Jury Instructions

The propriety of jury instructions, or their omission, is a question of law reviewed de novo using the following standard: "[w]hether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." State v. Bovee, 139 Hawai'i 530,

24

537, 394 P.3d 760, 767 (2017) (quoting State v. Frisbee, 114 Hawai'i 76, 79, 156 P.3d 1182, 1185 (2007)); Kobashigawa v. Silva, 129 Hawai'i 313, 320, 300 P.3d 579, 586 (2013).

## IV. DISCUSSION

### A. The Circuit Court Erred in Precluding the Defense from Adducing Third-Party Culpability Evidence that Miller Was the Person Who Assaulted the CW.

Kato contends that there was sufficient evidence under State v. Rabellizsa, 79 Hawai'i 347, 903 P.2d 43 (1995), to show a legitimate tendency that Miller was the person who committed the stabbing, and thus the court erred in not allowing her to elicit testimony about Miller's motive to assault the CW with a knife.

In Rabellizsa, this court considered as a matter of first impression the admissibility of "evidence of a third person's motive to commit the crime for which the defendant was charged." 79 Hawai'i at 350, 903 P.2d at 46. The Rabellizsa court, citing a series of cases from other jurisdictions, noted that generally motive alone is not sufficient to establish relevance; rather, there must be a "nexus between the proffered evidence and the charged crime." Id. (quoting Winfield v. United States (Winfield I), 652 A.2d 608, 613 (D.C. 1994) (stating that evidence must "clearly link" a third party to the commission of the crime)).

25

The court in Rabellizsa quoted from People v. Green, which held that, to be admissible, a third party's motive to commit the crime "must be coupled with substantial evidence tending to directly connect that person with the actual commission of the offense." Id. (quoting 609 P.2d 468, 480 (Cal. 1980)). This court stated that the California Supreme Court "[f]ollowing Green," held in People v. Hall that "there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." Id. (emphasis omitted) (quoting 718 P.2d 99, 104 (Cal. 1986)).

The Rabellizsa court additionally cited State v. Denny, wherein the Wisconsin Court of Appeals held that, for third-party culpability evidence to be admissible, "there must be a 'legitimate tendency' that the third person could have committed the crime." Id. (quoting 357 N.W.2d 12, 17 (Wis. Ct. App. 1984) (requiring a defendant to show motive, opportunity, and "some evidence to directly connect a third person to the crime charged which is not remote in time, place or circumstances" for the evidence to be admissible)).

In light of the authority that it had reviewed, the Rabellizsa court adopted Denny's "legitimate tendency" test, stating that it "comports with the relevancy test set forth in HRE Rule 401." Id. at 351, 903 P.2d at 47. Thus, while this court recognized the applicability of HRE Rule 401 to the

admissibility of third-party culpability evidence, such evidence was additionally required to meet a "legitimate tendency" test. Id.  Although the court in Rabellizsa did not specifically define the "legitimate tendency" test, our trial and appellate courts in applying the test have frequently required the defendant, when offering third-party culpability evidence, to meet varying standards, such as by showing "substantial evidence" or "direct evidence" that the third party is "directly connected," "clearly linked," or has a "nexus" to the commission of the charged offense."[19]  Here, the circuit court, as part of its ruling on the admissibility of the third-party culpability evidence, stated that, "But I don't know if that's a nexus.  I mean nobody saw [Miller] near the scene" and that under "Rabellizsa, no nexus."

In the 25 years since Rabellizsa was decided, almost all of the decisions underlying our holding in Rabellizsa have been clarified or modified by subsequent caselaw in those

---

[19]    See, e.g., State v. Griffin, 126 Hawai‘i 40, 54, 266 P.3d 448, 462 (App. 2011) (quoting Rabellizsa as holding that "there must be a nexus between the proffered evidence and the charged crime" and that third-party motive "must be coupled with substantial evidence tending to directly connect that person with the actual commission of the offense"); State v. Peralto, 95 Hawai‘i 1, 3 n.1, 18 P.3d 203, 205 n.1 (2001) (holding there was no trial error relating to any alternative theory of the crime absent "evidence to directly connect [a third party] to the crime charged" that is not remote in time, place or circumstances (quoting Rabellizsa, 79 Hawai‘i at 350, 903 P.2d at 46)); State v. Kato, No. CAAP-15-0000329, 15-17 (quoting Rabellizsa's recitation of the standard set forth in People v. Green).

27

jurisdictions.  It is therefore appropriate to reassess our continuing application of the "legitimate tendency" test.

Initially, it is noted that the Rabellizsa court, in the beginning of its analysis, set forth the following: "As stated in People v. Green" and then quoted its standard for the admission of third-party culpability evidence.  Rabellizsa, 79 Hawai'i at 350, 903 P.2d at 46 (quoting Green, 609 P.2d at 480).  Immediately after the quotation, the Rabellizsa court stated: "Following Green, the California Supreme Court held that" and then quoted from People v. Hall.  Id. (quoting Hall, 718 P.2d at 104).  However, the Hall court had overruled the Green standard and held that it was "not to be followed."  Hall, 718 P.2d at 104 n.3.  The Rabellizsa court did not reference the overruling of Green, and although it did not adopt the test set forth in Green, the passage quoted in the Rabellizsa decision has been followed or quoted in subsequent Hawai'i cases that have cited Rabellizsa.[20]  Further, the California Supreme Court in Hall, in

---

[20]    The quoted passage states as follows:

It is settled . . . that evidence that a third person had a motive to commit the crime with which the defendant is charged is inadmissible if it simply affords a possible ground of suspicion against such person; rather, it must be coupled with substantial evidence tending to directly connect that person with the actual commission of the offense. . . . The rule is designed to place reasonable limits on the trial of collateral issues . . . and to avoid undue prejudice to the People from unsupported jury speculation as to the guilt of other suspects . . . .

Rabellizsa, 79 Hawai'i at 350, 903 P.2d at 46 (emphasis added) (alterations in original) (quoting Green, 609 P.2d at 480).  The underlined clause was

(continued . . .)

articulating a requirement that a defendant present direct or
circumstantial evidence linking the third person to the
commission of the crime, stressed that "courts should simply
treat third-party culpability evidence like any other evidence:
if relevant it is admissible (§ 350) unless its probative value
is substantially outweighed by the risk of undue delay,
prejudice, or confusion (§ 352)." Id. at 104 (emphasis added).[21]

Rabellizsa also relied on Winfield I to establish that
there "must be a nexus between the proffered evidence and the
charged crime." Rabellizsa, 79 Hawai'i at 350, 903 P.2d at 46
(internal quotations omitted) (quoting Winfield I, 652 A.2d at
613). But upon rehearing en banc in the same case, the D.C.
Court of Appeals made clear that the test for relevance for
third-party culpability evidence is the same test as for any

---

(. . . continued)

applied, for example, by the ICA in State v. Griffin and nearly quoted in
full by the ICA in this case. See supra note 19.

[21] California Evidence Code (Cal. Evid. Code) § 350 (1967) provides
that "No evidence is admissible except relevant evidence."

Cal. Evid. Code § 210 (1967) states that "'Relevant evidence'
means evidence, including evidence relevant to the credibility of a witness
or hearsay declarant, having any tendency in reason to prove or disprove any
disputed fact that is of consequence to the determination of the action."

Cal. Evid. Code § 352 (1967) provides as follows: "The
court in its discretion may exclude evidence if its probative value is
substantially outweighed by the probability that its admission will (a)
necessitate undue consumption of time or (b) create substantial danger
of undue prejudice, of confusing the issues, or of misleading the
jury."

other crime, noting that it had "explicitly tied the relevance standard to the usual meaning of that concept." Winfield v. United States (Winfield II), 676 A.2d 1, 4 (D.C. 1996). Further, the court in Winfield II concluded "that the phrase 'clearly linked' is unhelpful and should be discarded from our lexicon of terms governing the admissibility of third-party perpetrator evidence." Id. at 3. The court explained that "[a] requirement that evidence 'tend to indicate some reasonable possibility that a person other than the defendant committed the charged offense' sufficiently accommodates" the concern about distracting the jury from the issue of the defendant's guilt. Id. at 5 (first emphasis added) (citations omitted).

The court in Winfield II noted that a trial judge could exclude evidence of third-party motivation "unattended by proof that the party had the practical opportunity to commit the crime, including at least inferential knowledge of the victim's whereabouts." Id. However, the court explained that a defendant did not need to place the third-party at or near the murder scene at the relevant time given the "combined force of the proffered circumstances." Id. at 6; accord Johnson v. United States, 136 A.3d 74, 80 (D.C. 2016) (holding that "practical opportunity" in the third-party culpability context did not require proof actually placing the third party at or near the crime scene). The court also cautioned that "the trial

30

court must resolve close questions of admissibility in [third-party culpability cases] in favor of inclusion, not exclusion," because "[u]nduly restricting admission of third-party perpetrator evidence would raise concerns of unequal treatment."[22]  Winfield II, 676 A.2d at 6-7; accord Turner v. United States, 116 A.3d 894, 917 (D.C. 2015) ("[C]lose questions of admissibility should be resolved in favor of inclusion, not exclusion.").

The "legitimate tendency" analysis applied by the Wisconsin Supreme Court in Denny has also been revisited by that court because "it does not provide complete clarity as to the meaning and contours of two of its prongs."  State v. Wilson, 864 N.W.2d 52, 64 (Wis. 2015).[23]  While the Wilson court reaffirmed the use of the Denny test in evaluating the admissibility of third-party culpability evidence, it also concluded that the "ambiguity" in the three prongs of the "legitimate tendency" test is "understandable in light of the

_____

[22]    Justice Nakayama's dissent (dissent) states that the Winfield II court reaffirmed the holding of Beale v. United States, 465 A.2d 796, 803 (D.C. 1983), cert. denied, 465 U.S. 1030 (1984), as it relates to third party culpability evidence.  Dissent at 28 n.26.  However, the Winfield II court specifically stated, "To the extent our decisions in Brown [v. United States, 409 A.2d 1093 (D.C. 1979)], Beale, and later cases, e.g., Watson v. United States, 612 A.2d 179, 182 (D.C. 1992), impose a more exacting standard of relevance [than FRE 401], we disavow them."  Winfield II, 676 A.2d at 5.

[23]    The Denny "legitimate tendency" test requires third-party culpability evidence to show three prongs: (1) motive, (2) opportunity, and (3) a direct connection to the crime.  Wilson, 864 N.W.2d at 64-67.

31

multitude of fact situations in which the Denny test may be employed." Id. In addition to the Wilson court's clarifications to the "legitimate tendency" test, the Wisconsin Supreme Court has also curtailed its application in other contexts:

> If we were to apply Denny's legitimate tendency test to unknown, third-party evidence, the bright line test established in Denny would be rendered meaningless . . . . [W]e hold that the test is not applicable to the introduction of allegedly similar crime evidence that is committed by an unknown third party.

State v. Scheidell, 595 N.W.2d 661, 668 (Wis. 1999) (determining that the standard for admissibility of similar crime evidence would be governed by other crimes, wrongs, or acts evidence). The Scheidell court opined that a defendant simply could not establish a plausible motive for an unknown defendant and thus would face "an insurmountable barrier to admissibility." Id. at 668. The Wisconsin Supreme Court further determined that the "legitimate tendency" test would also not apply to "frame-up evidence," i.e., evidence that the defendant was being framed for the crime. State v. Richardson, 563 N.W.2d 899, 903 (Wis. 1997). Finally, even prior to our holding in Rabellizsa, the Wisconsin Supreme Court had determined that proffered third-party culpability evidence "must connect that person to the

crime, either directly or <u>inferentially</u>." <u>Michael R.B. v. State</u>, 499 N.W.2d 641, 646 (Wis. 1993) (emphasis added).[24]

The Hawai'i Rules of Evidence "govern proceedings in the courts of the State of Hawaii." HRE Rule 101 (1993). We have explained that "the basic precondition for admissibility of all evidence is that it is relevant as that term is defined in HRE Rule 401." <u>Medeiros v. Choy</u>, 142 Hawai'i 233, 245, 418 P.3d 574, 586 (2018) (quotations, alterations, and emphasis omitted) (citing Commentary to HRE Rule 402 (1980)). HRE Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In <u>Rabellizsa</u>, this court stated that "we are persuaded that the 'legitimate tendency' test comports with the relevancy test set forth in HRE Rule 401." 79 Hawai'i at 351, 903 P.2d at 47. However, requiring a defendant to satisfy a "legitimate tendency" test to admit

---

[24] The dissent asserts that <u>Richardson</u> would not apply here because Kato was able to introduce, through Mochizuki's testimony, evidence of the note she argued Miller used to frame her. Dissent at 30 n.27. Kato's defense was that Miller committed the crime and framed her by luring her to the crime scene by the note left at her door; however the circuit court precluded her from arguing this defense to the jury. The dissent also argues that this opinion does not consider language from <u>Michael R.B.</u> that distinguishes "inferential" from "speculative connection." Dissent at 30 n.27. On the contrary, we simply note that <u>Michael R.B.</u> does not require a defendant to show a direct connection, but rather allows the defendant to present third-party culpability evidence that inferentially connects the third party to the crime.

third-party culpability evidence exceeds the "any tendency" threshold of HRE Rule 401, and thus the test is not fully consistent with the Hawai'i Rules of Evidence.

Accordingly, we hold that the threshold for admissibility of third-party culpability evidence should be understood as applying the same relevancy test that is applied for all other evidence, whether it is offered by the State or by the defendant.  HRE Rule 401; accord Hall, 718 P.2d at 104 ("[C]ourts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible [] unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion [].");  Winfield II, 676 A.2d at 4 (noting that it had "explicitly tied the relevance standard to the usual meaning of that concept" for third-party culpability evidence);  Gray v. Commonwealth, 480 S.W.3d 253, 267 (Ky. 2016) ("At its heart, the critical question for [a third-party culpability theory of defense] is one of relevance: whether the defendant's proffered evidence has any tendency to make the existence of any consequential fact more or less probable.  And the best tool for assessing the admissibility of [third-party culpability] evidence is the Kentucky Rules of Evidence." (footnote omitted));  State v. Gibson, 44 P.3d 1001, 1004 (Ariz. 2002) (en banc) ("Rules 401, 402, and 403, Arizona Rules of Evidence, set forth the proper test for determining the

admissibility of third-party culpability evidence."); People v. Primo, 753 N.E.2d 164, 168 (N.Y. 2001) ("'Clear link' and similar coinages, however, may be easily misread as suggesting that evidence of third-party culpability occupies a special or exotic category of proof. The better approach, we hold, is to review the admissibility of third-party culpability evidence under the general balancing analysis that governs the admissibility of all evidence."); Tibbs v. State, 59 N.E.3d 1005, 1011 (Ind. Ct. App. 2016) ("Evidence which tends to show that someone else committed the crime makes it less probable that the defendant committed the crime and is therefore relevant under [Evidence] Rule 401" (alteration in original)).

Thus, when a defendant seeks to introduce third-party culpability evidence, the defendant must initially clear no higher hurdle than that set by HRE Rule 401.[25] The lack of a "direct" link does not mean that the evidence is not relevant under HRE Rules 401. A defendant need not place the third party at or near the scene of the crime; it is sufficient for

---

[25] To the extent that Rabellizsa and any other decision of this court or the ICA have held that defendants must show that the third-party is "directly connected to the commission of the charged offense" or that the third party has a "nexus" or "direct link" to the offense, such tests are superseded by this opinion. See Rabellizsa, 79 Hawai'i at 350-51, 903 P.2d at 46-47; Peralto, 95 Hawai'i at 2 n.1, 18 P.3d at 204 n.1. Likewise, we reject the formulation set forth in Griffin, 126 Hawai'i at 54, 266 P.3d at 462, that evidence of third-party motive "must be coupled with substantial evidence tending to directly connect that person with the actual commission of the offense," as inconsistent with HRE Rule 401.

relevancy considerations that the defendant has provided direct or circumstantial evidence tending to show that the third person committed the crime.  See HRE Rule 401.  Further, we agree with the Washington D.C. Court of Appeals that a trial court should resolve a close question of admissibility in favor of the defendant.  Winfield II, 676 A.2d at 6-7.

In this case, significant evidence was presented that had a tendency to show that Miller was the person who committed the offense against the CW.  Three different witnesses, the CW, Morie, and Mosher testified that they saw a male either stab or chase the CW.  Officer Locey believed, based on the CW's statements in the coffee shop, that he was looking for a Caucasian male.  At trial, the CW explained that her assailant spoke poor Japanese.  Kato proffered evidence that Miller was a Caucasian male, a non-native speaker of Japanese, and close in height to the person who did the stabbing as described by the CW.  The CW was stabbed with a knife; Kato showed that Miller carried a "quick release" knife for work, which indicates his access to and familiarity with knives.  Through Mochizuki's testimony, Kato showed that Miller was together with Kato immediately before the offense.  Also through Mochizuki, Kato established her suspicions that Miller arranged to have her near the crime scene through the note she believed he had written. From Morie's testimony it can be inferred that Miller was likely

the man called shortly after the CW was stabbed and that when he told Morie that he would retrieve the phone, Kato arrived instead. This gives rise to a strong inference that Miller was in direct contact with Kato shortly after the CW was stabbed.

Additionally, based on Miller's testimony at the pretrial Rule 104 hearing, Kato showed that Miller had previously dated the CW, wanted to marry her, and had not wanted to end his relationship with the CW. Further, the defense proffered that Kato's testimony would show Miller had gone through the CW's phone and found text messages to other men and told Kato about this on October 23, 2013, that he informed Kato the CW was having sex with other men, and that he was "angry and upset at [the CW]." Miller's testimony and the defense's proffer underscored Miller's anger toward CW and provided a motive for him to want to physically assault the CW. Also, at the pretrial HRE Rule 104 hearing, defense counsel stated that Kato was prepared to testify that she believed Miller was setting her up in revenge for ruining his life by having him arrested for physically assaulting her.

The proffered evidence had a tendency, either directly or circumstantially, to implicate Miller as the person who

stabbed the CW.[26]  In fact, the evidence at trial alone so strongly indicated that Miller was the perpetrator of the stabbing that this course of events is manifested in the jury communications to the court, acknowledged by the State in its answering brief, recognized by the ICA in its memorandum opinion, and reflected in the jury's verdict.[27]  Applying HRE Rule 401, there was ample evidence that had a tendency to show that Miller was the person who assaulted the CW, which indisputably was a fact of consequence to the determination of the action.  Further, the evidence adduced also readily satisfied the "legitimacy tendency" test applied by the circuit court and was improperly excluded on this basis.[28]

---

[26]    The evidence also allows an inference that Kato and Miller were working in tandem, with Miller committing the stabbing and Kato aiding Miller in committing the offense.

[27]    As stated, the jury specifically asked the court whether it could "consider whether someone else aided [Kato]," and they were told in response to follow the court's instructions.  The jury next informed the court that "there is reasonable doubt whether [Kato] actually held the knife and stabbed [the CW]" and that "others feel that there is proof beyond a reasonable doubt that [Kato] took actions to lead [the CW] to Kaunaoa St. where someone was waiting to stab [the CW]."  The jury then asked "does the charge include [Kato] intentionally conspiring to have [the CW] stabbed without actually being the stabber?"  The court responded "no" to the jury's second question.
        Also, as noted, the State acknowledged in its answering brief that it had "failed to prove beyond a reasonable doubt that [Kato] was the stabber and inflicted bodily injury upon [the CW]."  Likewise, the ICA noted that someone other than Kato might have been the CW's assailant.

[28]    The dissent cites other evidence in the record that, in its view, refutes the relevancy of the third-party culpability evidence: for example, Miller said that he was not angry when the CW stopped contacting him, he never spoke to her about marriage, and he did not find out that the CW was seeing other men during or after their relationship.  Dissent at 35 n.33.  But it is not the trial court's responsibility in determining the relevancy

(continued . . .)

Once a defendant has cleared the threshold of HRE Rule 401, the court must still evaluate whether the proffered evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." HRE Rule 403 (1993).

In this case, the probative value of the proffered evidence was indisputably not substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay or waste of time. See HRE Rule 403. The excluded evidence was of fundamental importance to the jury in its determination of the charge in this case and deprived Kato of a fair trial. The circuit court erred in precluding Kato from introducing third-party culpability evidence and in foreclosing defense counsel from arguing in closing argument that Miller assaulted the CW or framed Kato for the attack. The error prejudicially affected

_____

(. . . continued)

of evidence to weigh conflicting evidence, whether such evidence is in the form of testimony or an offer of proof. Additionally, the dissent concludes that "Miller, at 5'10", is much taller than the suspect." Dissent at 33. However, the CW on the night of the incident told Officer Trevino, who was Japanese speaking, the height of her attacker in centimeters, which the officer converted to 5'9". Further, Mosher testified that the suspect was 5'6" to 5'8". Again, as further discussed in Part IV.B, infra, it is not the function of the trial court to resolve such factual disputes in determining the admissibility of third-party culpability evidence.

Kato's right to present her defense and to a fair trial, and it was clearly not harmless beyond a reasonable doubt. See State v. DeLeon, 143 Hawai'i 208, 218-19, 426 P.3d 432, 442-43 (2018) (holding trial court's exclusion of specific instances of victims' prior violent acts when there was actual dispute as to who was the first aggressor was not harmless error).[29]

## B. The Circuit Court and the ICA Improperly Weighed the Third-Party Culpability Evidence Proffered by Kato.

Both the circuit court and the ICA, in reaching the erroneous conclusion to exclude third-party culpability evidence, improperly weighed the evidence offered by the defense to support its admission. During pre-trial hearings and at trial, Kato proffered evidence that Miller was a Caucasian male, a non-native speaker of Japanese, and was 5'10". Kato also elicited testimony from witnesses that the CW's assailant was a Caucasian male, a non-native speaker of Japanese, and around

---

[29] The dissent misapprehends the holding of this opinion, contending that our decision would allow "third-party motive evidence alone" to establish relevancy. Dissent at 2, 26, 33. Instead, our opinion applies HRE Rule 401's relevancy standard to proffered third-party culpability evidence in the same manner as that rule applies to all other evidence. It rejects the higher burden adopted in Rabellizsa, which is not consistent with the Hawai'i Rules of Evidence. Evaluating the admissibility of third-party culpability evidence under HRE Rules 401 and 403 is not a "flimsy standard," as characterized by the dissent, dissent at 32, as emphatically demonstrated by HRE Rules 401 and 403's uniform applicability to all other forms of evidence and upon which our courts rely upon to provide fair and efficient trials. Finally, the dissent maintains that it is disingenuous for this opinion to not cite other jurisdictions that have held third-party motive is relevant only when there is additional evidence to connect the third person to the crime. Dissent at 26-27. As stated, we do not hold that evidence of a third party's motive on its own will ipso facto allow admissibility of such evidence, instead HRE Rule 401 and Rule 403 govern.

5'7" to 5'9" in height.  In explaining its ruling to deny the admission of the third-party culpability evidence, the circuit court stated that no one saw Miller at the scene, there was testimony that the assailant was Asian while Miller is Caucasian, Miller was not bothered by seeing the CW with other men, and Miller was around 5'10" tall.  Similarly, in affirming the circuit court's ruling that Kato's proffered evidence did not show that Miller committed the crime, the ICA stated that the CW would have recognized Miller's voice if he was the assailant, Miller was not connected to the LINE app, no evidence showed that Miller had possession of Kato's phone, and Kato gave an inconsistent story to her roommate about losing her phone.

In Holmes v. South Carolina, the United States Supreme Court considered an evidentiary rule adopted in South Carolina caselaw that excluded third-party culpability evidence "where there is strong evidence of [a defendant's] guilt, especially where there is strong forensic evidence."  547 U.S. 319, 329 (2006) (alteration in original).  The Supreme Court noted that, under South Carolina's rule, "if the prosecution's case is strong enough, the evidence of third-party guilt is excluded even if that evidence, if viewed independently, would have great probative value[.]"  Id.  The Court observed that the logic of South Carolina's rule required evaluating the State's evidence, which cannot be done without making the type of factual findings

of credibility and reliability of the evidence, traditionally

reserved for the trier of fact.  Id. at 330.

> Just because the prosecution's evidence, if credited, would provide strong support for a guilty verdict, it does not follow that evidence of third-party guilt has only a weak logical connection to the central issues in the case.

Id.  Without considering challenges to the reliability of the

State's evidence, the Supreme Court held that "no logical

conclusion" could be reached regarding the strength of the

defense's evidence, nor could the State's evidence be accurately

assessed, especially when the State's evidence had not been

conceded.  Id. at 331.  The Court hypothesized that an inverse

rule, i.e., one requiring the State to show that its evidence

against the defendant is not countered by evidence showing that

the defendant is not guilty, would be equally illogical.  Id. at

330.

The Holmes court concluded that basing the

admissibility of a defendant's third-party culpability evidence

solely on the strength of the State's evidence is "arbitrary,"

and does not "rationally serve" the goal of third-party

culpability rules.  Id. at 330-31.  Thus, the Supreme Court held

that South Carolina's rule violated a defendant's right in a

criminal case to have a "meaningful opportunity to present a

complete defense."  Id. at 331.

The very concern raised in Holmes, namely the ability

of a defendant to introduce third-party culpability evidence on

its own merit, was present in this case.  Here, the circuit court and the ICA, when evaluating whether Kato's proffered evidence and the evidence adduced during trial had a "legitimate tendency" to show that Miller was the person who assaulted the CW, both incorrectly weighed and relied on evidence tending to show that Miller was not the assailant.

The circuit court credited the State's evidence showing that the assailant was female, Asian, and shorter than Miller.[30]  In so crediting the State's evidence, the circuit court necessarily determined that Kato's evidence showing that the assailant was male, white, around the same height as Miller, and spoke poor Japanese and was a nonnative speaker of Japanese was not credible.  The ICA similarly evaluated the State's evidence, crediting Miller's testimony that he had not used the LINE app and determining that Miller was not the CW's assailant because the CW would have recognized him.  In so concluding, the ICA necessarily gave no weight to Kato's proffered evidence that Miller had access to her phone and thus her LINE app, ignored the CW's testimony that Kato was not the individual who stabbed her and that the assailant was not a native Japanese speaker,

---

[30]  The circuit court also credited Miller's testimony that he was not upset at the CW despite (1) Miller's testimony that he had wanted to marry the CW and that she just stopped contacting him without telling him that they were officially breaking up, and (2) proffered defense evidence that Miller had found text messages to other men on the CW's phone, Miller knew she was having sex with other men, and Miller was upset and angry at the CW.

and rejected all the evidence from witnesses whose description of the assailant did not match Kato. Because much of the State's evidence was not conceded and by selectively crediting evidence, the circuit court and the ICA made determinations that should have been reserved to the jury for its consideration. Holmes, 547 U.S. at 330; see also State v. Aplaca, 96 Hawai'i 17, 25, 25 P.3d 792, 800 (2001) (holding that the circuit court erred by not submitting the question of the victim's age and the defendant's knowledge of the victim's age to the jury); State v. Tamura, 63 Haw. 636, 637-38, 633 P.2d 1115, 1117 (1981) (per curiam) ("The jury, as the trier of fact, is the sole judge of the credibility of witnesses or the weight of the evidence.").

When a court excludes a defendant's third-party culpability evidence based solely on the weight of the State's evidence tending to show that there was not a third-party perpetrator, its decision arbitrarily excludes such evidence and violates a defendant's right to have a "meaningful opportunity to present a complete defense." Holmes, 547 U.S. at 331. Because the circuit court and the ICA impermissibly rejected Kato's proffered evidence based on the State's contested evidence that Miller did not match the height, race, sex, and Japanese fluency of the assailant, each court erred in the manner that it evaluated the admissibility of the third-party culpability evidence. The circuit court's error in excluding

44

the evidence prejudicially affected Kato's right to a fair trial and was not harmless beyond a reasonable doubt. See State v. Pulse, 83 Hawai'i 229, 248, 925 P.2d 797, 816 (1996) (holding that the exclusion of competent testimony that infringed upon a constitutional right of the accused was presumptively prejudicial and was not harmless error).[31]

### C. The Circuit Court Utilized the Proper Standard and Did Not Abuse Its Discretion in Evaluating Miller's Invocations of His Fifth Amendment Privilege.

Article I, section 10 of the Hawai'i Constitution, which is virtually identical to the Fifth Amendment to the United States Constitution,[32] provides in pertinent part that "no person shall . . . be compelled in any criminal case to be a witness against oneself" (Fifth Amendment privilege). Haw. Const. art. I, § 10. The Fifth Amendment privilege applies to any testimony an individual gives, whether at the person's own

---

[31] The dissent argues that the circuit court and the ICA did not selectively credit the State's evidence and that this opinion relies on defense counsel's offer of proof instead of evidence in the record. Dissent at 35 n.34. The evidence was not in the evidentiary trial record because the circuit court excluded it after improperly weighing the State's evidence against the defense's proffer. The requisite record for admission of the evidence was established in accordance with HRE Rule 103(a)(2) (Supp. 2012), which provides as follows: "In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." Kato's counsel stated to the circuit court the underlying bases for the admissibility of the third-party culpability evidence.

[32] The Fifth Amendment to the United States Constitution provides in relevant part, "No person shall . . . be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V.

criminal proceedings or at the proceeding of another.  State v. Kupihea, 80 Hawai'i 307, 313, 909 P.2d 1122, 1128 (1996).

In evaluating the extent of a witness's Fifth Amendment privilege, this court has stated that the privilege does not protect against "remote possibilities [of future prosecution] out of the ordinary course of law" but is instead "confined to instances where the witness has reasonable cause to apprehend danger from a direct answer."  Kupihea, 80 Hawai'i at 313, 909 P.2d at 1128 (alteration in original) (first quoting Territory of Hawaii v. Lanier, 40 Haw. 65, 72 (Haw. Terr. 1953); and then quoting Hoffman v. United States, 341 U.S. 479, 486 (1951)).  The privilege against self-incrimination "extends not only to answers that would in themselves support a conviction, but to those that would furnish a link in the chain of evidence needed to prosecute."  Id. at 313, 909 P.2d at 1128 (quoting Lanier, 40 Haw. at 72).

Kato argues that the circuit court incorrectly used a "possibility of prosecution standard" in assessing Miller's invocation of the privilege instead of the "reasonable cause to apprehend danger from a direct answer" standard.[33]  Kato also contends that there was no indication that the State would charge Miller for the CW's stabbing or prosecute Miller for the

---

[33]  Although we resolve this case on other grounds, we address this issue in light of the possibility that it may arise again on retrial.

46

abuse charge or any TRO violations, and thus he should not have been permitted to exercise his Fifth Amendment rights.

During the HRE Rule 104 hearing at trial, the circuit court allowed Miller to exercise his Fifth Amendment privilege on questions regarding his previous relationship with Kato and his communications with her from August to October 2013, because Miller could still be prosecuted for the abuse charge as it was dismissed without prejudice and could be charged with violating the TRO as it did not expire until December 25, 2013. The court also allowed Miller to invoke the privilege with regard to questions that could have shown that Miller was angry at the CW for ending their relationship or dating other men and relating to communications he had with the CW after the end of their relationship that would show he knew the whereabouts of the CW. The court stated that answering questions about communications with Kato was going to "lead directly to" Miller arranging the stabbing and that answering questions about post-relationship communications with the CW would show that he knew her whereabouts near the time of the incident, which would furnish a link in the chain of prosecution.

Thus, the circuit court applied the correct legal standard in assessing Miller's invocation of the Fifth Amendment privilege. The court also did not abuse its discretion in concluding that Miller had reasonable cause to apprehend danger

47

from answers to questions regarding his previous relationship with Kato and communications with Kato from August to October 2013, as Miller was still subject to prosecution for the abuse incident and for violation of the TRO. Additionally, the court did not abuse its discretion in concluding that answers regarding motive to harm the CW and communications with the CW after the end of their relationship may have furnished a link in a chain of prosecution by showing that Miller had the motive and opportunity to assault the CW. Accordingly, the circuit court did not err in its rulings on Miller's exercise of his Fifth Amendment privilege, which were properly affirmed by the ICA.[34]

---

[34] At trial, Kato argued that Miller had waived his Fifth Amendment privilege, and Kato briefly references this circumstance in her Application: "Miller had answered a number of questions after the first 104 hearing and then changed his positions during the second 104 hearing." The circuit court did not rule on whether Miller had waived the privilege. On remand, if Miller again asserts his privilege to questions that he answered at his pretrial Rule 104 hearing, the court will need to address whether Miller waived his Fifth Amendment privilege under HRE Rule 511 (1993):

> A person upon whom these rules confer a privilege against disclosure waives the privilege if, while holder of the privilege, the person or the person's predecessor voluntarily discloses or consents to disclosure of any significant part of the privileged matter. This rule does not apply if the disclosure itself is a privileged communication.

See also Naipo v. Border, 125 Hawai'i 31, 36, 251 P.3d 594, 599 (2011) (a witness voluntarily waives the privilege if the witness is "expressly advised of the privilege and testifies without asserting the privilege").

## D. The Circuit Court Did Not Plainly Err in Failing to Give an Accomplice Instruction to the Jury.

On appeal, Kato argues that, based on the jury instructions given, she could only have been found guilty of reckless endangering in the second degree if the jury found her to be the principal actor, i.e., the person who committed the stabbing. As the State only pursued a theory of principal liability and no accomplice instruction was given, Kato contends that she should not have been found guilty of reckless endangering in the second degree as the jury did not find her to be the principal actor. This raises the question as to whether the circuit court plainly erred in not giving an accomplice instruction to the jury.

"[I]t is the duty of the trial court to ensure that the jury is properly instructed." State v. Kikuta, 125 Hawai'i 78, 90, 253 P.3d 639, 651 (2011). In reviewing an omitted or flawed jury instruction, "we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, i.e., that the erroneous jury instruction was not harmless beyond a reasonable doubt." DeLeon, 131 Hawai'i at 479, 319 P.3d at 398 (quoting State v. Nichols, 111 Hawai'i 327, 337, 141 P.3d 974, 984 (2006)).

"The Hawaii and the federal Constitutions as well as our rules of penal procedure clearly require that appellants be informed of the charges against them." State v. Soares, 72 Haw. 278, 281, 815 P.2d 428, 430 (1991) (citing Haw. Const. art. I, § [14]; U.S. Const. amend. VI; Hawai'i Rules of Penal Procedure Rule 7(d); State v. Jendrusch, 58 Haw. 279, 567 P.2d 1242 (1977)).[35]

This court has held that a defendant does not need to be charged as an accomplice to permit the giving of an accomplice instruction. State v. Apao, 59 Haw. 625, 645, 586 P.2d 250, 263 (1978) superseded by statute on other grounds as stated in Briones v. State, 74 Haw. 442, 456 n.7, 848 P.2d 966, 973 n.7 (1993) (holding that under the facts of the case, it was not error for the court to instruct on accomplice liability); State v. Fukusaku, 85 Hawai'i 462, 486, 946 P.2d 32, 56 (1997). However, charging a defendant as a principal is not necessarily sufficient to provide the defendant with adequate notice of the charges as constitutionally required. Soares, 72 Haw. at 281, 815 P.2d at 430; State v. Toma, No. SCAP-13-0000029, at 5, 2015 WL 9303983, at *17-18 (Dec. 21, 2015) (mem.) (Pollack, J., dissenting) ("[I]t does not follow that charging a defendant as

---

[35]    See Haw. Const. art I, § 14 ("In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . . . ."); U.S. Const. amend. VI (same).

a principal provides a defendant sufficient notice that he or she must also be prepared to defend against an accomplice theory of liability."); see Fukusaku, 85 Hawai'i at 486, 946 P.2d at 56 (discussing facts and circumstances of the case to determine whether the defendant had sufficient notice of the nature of the charges).

In this case, Kato was not charged as an accomplice in the alleged commission of the attempted murder offense, and thus she did not receive any notice that the evidence at trial may subject her to a conviction based upon accomplice liability. Additionally, it is undisputed that the State's evidence was directed at proving that Kato was the person who stabbed the CW and the State did not present an accomplice theory of liability. Thus, the court did not plainly err in not submitting an accomplice instruction to the jury.

Kato contends, however, that she was convicted as an accomplice, and not as a principal, despite the fact that the jury was not instructed on accomplice liability. While there are certainly indications in the record that the jury may have concluded that Kato acted as an accomplice and not a principal, it is not necessary for this court to resolve whether the

possibility of such a determination prejudiced Kato in light of our disposition of this case on other grounds.[36]

### V. CONCLUSION

For the foregoing reasons, the ICA's April 18, 2019 Judgment on Appeal and the circuit court's March 11, 2015 judgment are vacated, and this case is remanded to the circuit court for further proceedings consistent with this opinion.

Myron H. Takemoto                    /s/ Sabrina S. McKenna
for petitioner

                                     /s/ Richard W. Pollack
Stephen K. Tsushima
for respondent                       /s/ Michael D. Wilson



---

[36] Kato also contends that there was not substantial evidence for the jury to convict her of reckless endangering in the second degree. Our caselaw has established that this offense can be a lesser-included offense of attempted murder. State v. Samonte, 83 Hawai'i 507, 541, 928 P.2d 1, 35 (1996). Appellate courts review the sufficiency of the evidence at trial for "substantial evidence." State v. Eastman, 81 Hawai'i 131, 135, 913 P.2d 57, 61 (1996).

Looking at the evidence in the most favorable light to the prosecution, there is substantial evidence for the jury to conclude that Kato lured the CW to the location where she was attacked. State v. Vliet, 91 Hawai'i 288, 293, 983 P.2d 189, 194 (1999) ("[T]his court, in passing upon the sufficiency of the evidence, must view the evidence in the light most favorable to the prosecution . . . ."). Messages retrieved on Kato's phone provide evidence that she either operated the "Ai Akanishi" LINE ID or was in contact with "Ai Akanishi." Kato thus would have been able to contact the CW as "Ai Akanishi" or would have been able to provide the CW's LINE ID to "Ai Akanishi." Kato was identified near the scene of the attack when she sought to retrieve the phone that had apparently been dropped there by the assailant. This evidence is of sufficient quality and probative value to allow the jury to find that Kato recklessly placed the CW in danger of death or serious bodily injury. See HRS § 707-714(1)(a). Accordingly, there was substantial evidence to support Kato's conviction for reckless endangering in the second degree.